RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0299p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

     *v.*

DARYL LAWRENCE,

        *Defendant-Appellant.*

No. 06-4105

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00011—Gregory L. Frost, District Judge.

Argued: October 5, 2011

Decided and Filed: October 22, 2013

Before: BOGGS, ROGERS and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Kort W. Gatterdam, CARPENTER, LIPPS & LELAND LLP, Columbus, Ohio, for Appellant. Robert A. Parker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kort W. Gatterdam, CARPENTER, LIPPS & LELAND LLP, Columbus, Ohio, Diane M. Menashe, DIANE M. MENASHE CO., L.P.A., Columbus, Ohio, for Appellant. Robert A. Parker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge. Daryl Lawrence appeals his convictions and sentences for armed bank robbery, attempted armed bank robbery, murder, and firearms offenses. Most of the twenty-four asserted claims of error relate to proceedings on the two death-eligible offenses and the resultant sentence of death. Despite vigorous and

1

able advocacy by Lawrence's counsel, we find no error in the proceedings below and, for the reasons that follow, affirm the judgment of the district court.

**I**

The charges against Lawrence arose from four bank robberies committed in central Ohio during January, August, and September 2004, and January 2005. During the last of these robberies, an attempted robbery on January 6, 2005, Lawrence shot and killed Columbus Police Officer Bryan Hurst. Officer Hurst had returned fire, however, and Lawrence was injured. Lawrence aborted the robbery and fled. He was arrested within days, whereupon he confessed to having committed all four robberies. An eight-count indictment was returned and filed in the United States District Court for the Southern District of Ohio on January 20, 2005.

The indictment charged Lawrence with three counts of armed robbery, in violation of 18 U.S.C. § 2113(a) and (d); two counts of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); one count of brandishing and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (iii); one count of attempted bank robbery resulting in the killing of Officer Hurst, in violation of 18 U.S.C. § 2113(a), (d) and (e); and one count of using a firearm during and in relation to a crime of violence to commit murder with malice aforethought, in violation of 18 U.S.C. § 924(c) and (j). The latter two counts, Counts Seven and Eight, charged death-eligible offenses, violations of 18 U.S.C. § 2113(e) and 18 U.S.C. § 924(j)(1), respectively. The indictment further alleged that Lawrence was eligible to be punished by death under the Federal Death Penalty Act, 18 U.S.C. § 3591(a); and charged two statutory aggravating factors in connection with the murder under 18 U.S.C. § 3592(c), i.e., that Lawrence knowingly created a grave risk of death to one or more persons in addition to the victim, and that Lawrence committed the murder in expectation of pecuniary gain.

Trial commenced with jury selection proceedings on February 13, 2006. Ten trial days later, the jury began and completed its deliberations in the guilt phase, finding

Lawrence guilty of all eight charges on February 28, 2006. The sentencing phase culminated with the jury's verdict on March 10, 2006, recommending a sentence of life imprisonment without parole on Count Seven and a sentence of death on Count Eight. On August 10, 2006, the district court sentenced Lawrence to a total of 781 months' imprisonment on Counts One through Six, to be served consecutively to the life term imposed for Count Seven, and imposed the death penalty for Count Eight.

Lawrence moved for a new trial, claiming juror bias, double jeopardy, improper jury instructions, and inconsistent sentencing verdicts on Counts Seven and Eight. The district court vacated the jury's death verdict on Count Eight and ordered a new sentencing hearing. *United States v. Lawrence*, 477 F. Supp. 2d 864, 867 (S.D. Ohio 2006). The United States appealed the district court's decision and we reversed. We held that the sentencing verdicts were not inconsistent or irrational and reinstated the sentence of death imposed by the district court on Count Eight. *United States v. Lawrence*, 555 F.3d 254, 256 (6th Cir. 2009).

Now on direct appeal, Lawrence raises twenty-four claims of error, listed here and addressed below in the order he presents them:

1. The jury's sentencing verdicts on Counts Seven and Eight were defective for lack of express certification that each juror would have made the same sentencing recommendation regardless of the race of Lawrence or the murder victim.

2. The district court erred by failing to instruct the jury on Count Eight that they had the option of recommending a sentence of imprisonment to a term of years less than life.

3. The district court erred by admitting improper and excessive victim-impact evidence in the sentencing phase.

4. The district court abused its discretion by denying Lawrence his right to allocution before the jury during the sentencing phase.

5. The district court erred by imposing a sentence of death under 18 U.S.C. § 924(c) and (j) where a greater minimum sentence, life imprisonment, was prescribed by another provision of law, 18 U.S.C. § 2113(e).

6. Where six jurors found that life imprisonment was appropriate and sufficient, the death sentence was imposed arbitrarily.

7.   The district court erred by refusing to strike the "pecuniary gain" statutory aggravating factor.

8.  The district court abused its discretion by allowing the government to introduce "lifestyle evidence" to prove the "pecuniary gain" aggravating factor.

9.  There was insufficient evidence to support a reasonable jury finding that Lawrence killed for pecuniary gain.

10.  The district court erred by refusing to strike the "grave risk of death" statutory aggravating factor.

11.  The district court erred by refusing to strike the non-statutory aggravating factors as the product of an unconstitutional delegation of power.

12.   The non-statutory aggravating factors should have been struck because the government failed to charge them in the indictment.

13.  The jury's determination that the aggravating factors outweighed the mitigating factors is not supported by sufficient evidence.

14.  Prosecution and sentencing under Counts Seven and Eight based on the nonstatutory aggravating factor "contemporaneous finding of guilt" violated the Double Jeopardy Clause.

15.   The district court erred by refusing to instruct the jurors that they had to unanimously agree, beyond a reasonable doubt, that the aggravating factors sufficiently outweighed the mitigating factors before selecting the death sentence.

16.  The district court erred by failing to instruct the jury that "a solitary juror may prevent a sentence of death."

17.  The district court erred by failing to give an adequate "malice aforethought" instruction.

18.  Prosecutorial misconduct during closing argument of the penalty phase denied Lawrence a fair trial.

19.  The district court erred by denying Lawrence's motion to suppress statements.

20.  Prosecution in federal court and imposition of the death sentence were tainted by racial bias, in violation of Lawrence's constitutional rights.

21.  The district court erred by allowing multiple "victims" to be present during the sentencing hearing.

22.  The district court erred by failing to investigate evidence of juror misconduct.

23.   The district court erred by allowing the government to peremptorily excuse prospective jurors because of their race.

24. The district court erred by failing to remove for cause prospective jurors whose impartiality was demonstrably compromised.

## II

### 1. Omission of Required Jury-Nondiscrimination Certification

Lawrence contends his sentencing was marred by "structural error" because the jurors failed to certify, in conjunction with their sentencing verdicts on Counts Seven and Eight, as required by the Federal Death Penalty Act, that they would have made the same sentencing recommendation irrespective of the race, color, religious beliefs, national origin, or sex of Lawrence or the victim, Bryan Hurst. Lawrence is African American; Hurst was white. All twelve jurors were white.

The Federal Death Penalty Act requires the district court to instruct the jury that,

> in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be.

18 U.S.C. § 3593(f). There is no question that the district court complied with this requirement and properly instructed the jury in this regard.

The Act, however, also requires the jury to *certify* that its decision to impose the death sentence was not discriminatory:

> The jury, upon return of a finding under subsection (e) [concerning a sentence of death], shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision *and* that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

*Id.* (emphasis added).  This certification requirement has two components.  The certification used by the district court and signed by the jurors included the first component.  All of the jurors signed the certification they were provided, certifying that consideration of race, color, religious beliefs, national origin, or sex played no role in their verdicts.  The certification form provided to the jurors, however, omitted the second component certifying that the jurors would have made the same recommendation irrespective of the race, color, religious beliefs, national origin, or sex of the defendant or victim.

Lawrence contends this omission is a structural error that requires us to vacate the Count Seven and Count Eight sentences because it "affected the framework within which the trial proceeded" and was not simply an error in the trial process itself.  *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  The government contends that the trial court's jury instructions included the pertinent language from § 3593(f), that the jurors' certification substantially included the required language, that Lawrence did not object to the omission at trial, and that the omission was not a structural error.

Generally, where the defendant failed to object to an error at trial, including instructional error, review on appeal is for plain error only.  *See* Fed. R. Crim. P. 30(d), 52(b); *Louis Jones v. United States*, 527 U.S. 373, 389 (1999).  We may address the objection in the first instance and grant relief under plain-error review only if four requirements are met:  (1) there must be a legal error (objection to which was not affirmatively waived); (2) the error must be clear; (3) the error must have affected the appellant's substantial rights in that it affected the outcome of the district court proceedings; and (4) the error must have seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Puckett v. United States*,  556 U.S. 129, 135 (2009).  "Meeting all four prongs is difficult, 'as it should be.'"  *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

However, an error that is "structural" may be cognizable despite the lack of a third-prong showing that it actually prejudiced the appellant or affected the outcome of the proceedings.  *United States v. Marcus*, 130 S. Ct. 2159, 2164–65 (2010); *United*

*States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005).  A structural defect is a "'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'"  *Johnson v. United States*, 520 U.S. 461, 468 (1997) (quoting *Fulminante*, 499 U.S. at 310); *see also Ruelas v. Wolfenbarger*, 580 F.3d 403, 410 (6th Cir. 2009).  "[M]ost constitutional errors can be harmless."  *Fulminante*, 499 U.S. at 306. In other words, even constitutional errors are disregarded if they are shown not to have affected substantial rights.  *Id.*; Fed. R. Crim. P. 52(a).  This harmless-error doctrine preserves the "'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'"  *Fulminante*, 499 U.S. at 308 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).  Structural defects, on the other hand, are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."  *Id.* at 309.

The Supreme Court has found structural errors only in "'a very limited class of cases,' including:  total deprivation of the right to counsel; judicial bias; the unlawful exclusion of grand jurors of defendant's race; denial of the right to self-representation at trial; the denial of the right to a public trial; and erroneous reasonable-doubt instruction to jury."  *Rosencrantz v. Lafler*, 568 F.3d 577, 589 (6th Cir. 2009) (quoting *Johnson*, 520 U.S. at 468–69); *see also Marcus*, 130 S. Ct. at  2164–65 (same).

There is no dispute that the omission of the second component from the certification form was in violation of 18 U.S.C. § 3593(f); it was a legal error that was "clear."  The first two requirements for plain-error relief are met.  As to the third element, Lawrence has not identified how the error affected his substantial rights. Arguing that the certification defect is structural error, he contends that he need not do so.

Lawrence cites no authority specifically holding that lack of  strict compliance with the Act's nondiscrimination certification requirement is structural error.  Nor does the omission of the second component of the certification requirement fall within any

recognized category of structural error. To the contrary, the certification requirement is complementary and analogous to a jury instruction, and jury instruction errors have generally been deemed non-structural and subject to harmless-error analysis. *See Marcus*, 130 S. Ct. at 2165.

Moreover, the certification is a statutory, not a constitutional, requirement. Unlike the rights to counsel, an impartial judge, equal protection, self-representation, a public trial, and an accurate reasonable-doubt instruction, the certification requirement is purely a creature of statute. Lawrence's constitutional rights were not violated when the district court erroneously omitted part of the statutory language from the certification form. Third, the certification requirement comes into play only at the end of the sentencing hearing when the jury is considering whether a sentence of death is justified. A defect in the form of the certification cannot be deemed to have affected the framework in which the trial proceeded; it affected only the jury's memorialization of its sentencing decision.

Lawrence contends the legislative history demonstrates that Congress deliberately included both components in the certification requirement in order to prevent the influence of racial prejudice in capital sentencing. He contends the omission of the second component from the certification was no mere technical defect, but directly contravened Congress's purpose and impermissibly opened the door to the possibility of racial bias. Citing *Turner v. Murray*, 476 U.S. 28 (1986), Lawrence contends the omission of the second § 3593(f) component is analogous to a trial court's refusal to question prospective jurors on racial bias in an interracial murder case. In *Turner*, the court granted relief, despite the absence of evidence of racial bias, because the refusal to explore the racial-bias issue in voir dire was deemed to have created "an unacceptable risk of racial prejudice infecting the *capital sentencing proceeding*." *Id.* at 37 (plurality opinion) (italics in original).

In *Turner*, however, the Court did not rule that the voir dire error was structural error.[1]  Nor was the *Turner* Court constrained to apply plain-error review, as the defendant's objection had been preserved.  Thus, although the refusal to ask the requested questions regarding racial bias was held to be error per se, obviating the need to show prejudice, the Court did not have occasion to determine whether the error "seriously affected the fairness, integrity or public reputation of judicial proceedings" as a prerequisite to granting relief.  Most importantly, *Turner* is further distinguishable in that the impetus for the finding of error per se, an unacceptable risk of racial prejudice infecting the sentencing proceeding, is lacking in this case.  Unlike the *Turner* trial court's refusal to inquire about racial bias in voir dire, the instant omission of the second component from the jury's § 3593(f) certification, substantially duplicative of the first component, can hardly be deemed to have created such an unacceptable risk of racial prejudice.

Although the Count Seven and Count Eight certifications were flawed, the omission was substantively harmless.  The jury was clearly instructed, in accordance with § 3593(e), that they were prohibited from considering race in their sentencing deliberations.  The jury was also correctly instructed that each juror had to be convinced that he or she would have reached the same sentencing decision regardless of race.  We ordinarily presume the jury followed its instructions, and Lawrence has offered nothing to rebut this presumption.  *See United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) (holding that, absent rebuttal, "jurors are presumed to follow instructions").  The record reveals no basis for any conclusion other than that the jurors followed the undisputedly correct instructions they were given. There simply is no reason to conclude that the omission of the second component from the certification forms created an unacceptable risk that racial prejudice infected the verdicts.

---

[1]In fact, the *Turner* Court, by limiting the relief awarded to striking down the death sentence and expressly declining to disturb the jury's verdict of guilt, necessarily implied that the voir dire error was not the sort of "defect affecting the framework within which the trial proceeds" that would amount to a structural error. *See id.* at 37.

We therefore reject Lawrence's argument that *Turner* represents sound support for the proposition that the certification defect warrants relief even in the absence of evidence that it affected his substantial rights and seriously affected the integrity of the sentencing proceeding. Lawrence has presented no grounds to hold that the certification defect affected either his substantial rights or the integrity of the proceedings. He has not satisfied the prerequisites for relief under plain-error review and his first claim of error must be denied. *See Marcus*, 130 S. Ct. at 2166 (denying relief under plain-error review—even if error were deemed structural—for lack of showing that error impugned the fairness, integrity, or public reputation of the proceedings).

### 2. Failure to Instruct on Option of Lesser Sentence on Count Eight

Lawrence contends the district court gave an erroneous jury instruction regarding sentencing options for Count Eight. Count Eight charged that Lawrence committed murder, as defined in 18 U.S.C. § 1111, by unlawfully killing Hurst with malice aforethought in the attempt to perpetrate a robbery, and with use of a firearm, in violation of 18 U.S.C. § 924(c). The penalties for this offense are death, imprisonment for any term of years, or life imprisonment. 18 U.S.C. § 924(j)(1). The penalties for first-degree murder under § 1111 are death or life imprisonment. However, § 924(j)(1) does not incorporate § 1111's penalty provisions, but only incorporates § 1111's definition of murder. *United States v. Ostrander*, 411 F.3d 684, 686 (6th Cir. 2005). It follows that the penalty options for the Count Eight murder are those prescribed in § 924(j)(1), not those prescribed in § 1111. In addition, the Federal Death Penalty Act authorizes three possible punishments: death, life imprisonment without possibility of release, or some lesser sentence. 18 U.S.C. § 3593(e).

The district court thus should have instructed the jury that it had three sentencing options. Instead, the court instructed that a sentence of death or life imprisonment without possibility of release were the only sentencing options. This was error. However, Lawrence did not object to this error at trial. Indeed, his proposed instruction included the same penalties for Count Eight as those incorporated into the court's instruction. We therefore review only for plain error. *See* Fed. R. Crim. P. 30, 52(b);

*Louis Jones*, 527 U.S. at 389. Again, Lawrence has the burden of showing that this clear error adversely affected his substantial rights and, if so, that it seriously affected the integrity or public reputation of the sentencing proceeding. *Puckett*, 556 U.S. at 135. This he has not done.

The district court's error in omitting the term-of-years sentencing option under § 924(j)(1) has not been shown to have affected Lawrence's substantial rights. To carry his burden in this regard, Lawrence must show there is "a reasonable probability" that, but for the instructional error, the jury's recommended sentence on Count Eight "would have been different." *Dominguez Benitez*, 542 U.S. at 81–82. Inasmuch as the jury unanimously recommended the death penalty on Count Eight rather than life imprisonment without release, there is no likelihood—much less "a reasonable probability"—that it would have opted to sentence Lawrence to a term of years if given the choice. Lawrence insists that such a conclusion is based on impermissible speculation. However, the notion that the jury would have sentenced Lawrence to a term of years on Count Eight if given the option is not reasonable; it defies all logic and reason.

Accordingly, though the district court committed error when it instructed the jury that death and life imprisonment were the only sentencing options on Count Eight, Lawrence has not demonstrated that the error affected his substantial rights. He has therefore not established entitlement to relief under plain-error review.

### 3. Admission of Improper Victim-Impact Evidence

Lawrence contends the district court erred by permitting improper and excessive use of victim-impact evidence by the government during the sentencing phase. Lawrence contends the evidence of the impact of Hurst's death went beyond the scope permitted by the Federal Death Penalty Act and the Eighth Amendment because it included inadmissible evidence of the impact on Hurst's community, co-workers, and friends, as well as cumulative family-impact evidence.

Before trial, Lawrence attempted to limit victim-impact evidence.  He moved to strike victim impact as a non-statutory aggravating factor, asked the district court to allow only one adult member of Hurst's family to testify and to require use of a prepared statement to do so, and objected to the government's intention to introduce evidence of the impact of Hurst's death on his friends and the community.  The district court denied Lawrence's motions and objections and directed that the government's victim-impact witnesses each prepare a written statement and submit them to the district court for review of their admissibility under 18 U.S.C. § 3593(a) and (c).  The district court had the witnesses read their statements verbatim without deviation.  At trial, Lawrence raised a general objection to the testimony from Hurst's family members.

Evidentiary rulings are generally reviewed for abuse of discretion.  *See*, *e.g.*, *United States v. Boyd*, 640 F.3d 657, 668 (6th Cir. 2011).  "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law."  *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007).  Constitutional challenges and questions of statutory interpretation are reviewed de novo.  *See United States v. Harold Jones*, 641 F.3d 706, 713 (6th Cir. 2011) (Fifth and Sixth Amendment challenge); *United States v. Rodriguez*, 581 F.3d 775, 796 (8th Cir. 2009) (FDPA).  An error of law is an abuse of discretion.  *Koon v. United States*, 518 U.S. 81, 100 (1996).  Under the FDPA, an error requires reversal only if the government cannot establish beyond a reasonable doubt that the error was harmless.  18 U.S.C. § 3595(c)(2)(C); *United States v. Lighty*, 616 F.3d 321, 363 (4th Cir. 2010).

The FDPA describes victim-impact evidence as "factors concerning the effect of the offense on the victim and the victim's family."  18 U.S.C. § 3593(a).  The Act permits evidence in the form of testimony, a victim-impact statement, "and any other relevant information."  *Id.*  The Supreme Court has sanctioned the use of victim-impact evidence in the sentencing phase of a capital trial.  "The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence."  *Louis Jones*, 527 U.S.

at 395. "'[T]he State has a legitimate interest in counteracting the mitigating evidence . . . by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'" *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)). In order "to assess meaningfully the defendant's moral culpability and blameworthiness," the jury should be permitted to consider the specific harm caused by the crime. *Id.* However, victim-impact evidence can violate a defendant's due process rights if it is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 825.

Eight witnesses for the prosecution read statements about Hurst and the impact of his death:  his mother, his stepfather, his mother-in-law, his widow, his sister, his brother, his cousin's husband, and a police officer who served with him.  Hurst's family members described his upbringing, his service in the Marines, his decision to join the Columbus Police Department, and his role as a husband and father.  The fellow officer told of his friendship with Hurst and serving with him on the police force.  Several of the witnesses spoke of their emotional responses to Hurst's death and called him a hero.

Lawrence challenges in particular the district court's admission of testimony by Hurst's friend and partner on the police force, Sergeant Donald Oliverio.  Testimony by a friend and co-worker, Lawrence argues, is beyond the scope permitted under the FDPA and Supreme Court precedent.

Courts have interpreted *Payne* and the FDPA to permit similarly situated witnesses, i.e., family members, friends, and co-workers, to give victim-impact testimony. *See United States v. Whitten*, 610 F.3d 168, 188–90 (2d Cir. 2010); *United States v. Bolden*, 545 F.3d 609, 626 (8th Cir. 2008); *United States v. Barrett*, 496 F.3d 1079, 1098–99 (10th Cir. 2007); *United States v. Nelson*, 347 F.3d 701, 712–14 (8th Cir. 2003); *United States v. Bernard*, 299 F.3d 467, 478–80 (5th Cir. 2002). Consistent with these authorities, we hold that the victim-impact evidence from Hurst's family members and fellow police officer was neither improper nor excessive.  Accordingly, the district court did not abuse its discretion by admitting it.

Lawrence insists that some of the victim-impact evidence clearly exceeded the scope permitted by the FDPA, citing *United States v. Fields*, 516 F.3d 923, 946–47 (10th Cir. 2008). In *Fields*, the defendant challenged evidence of the impact of the victim's death on co-workers and the community. The court was unwilling to approve such evidence to the extent that it involved "impersonal utilitarian considerations," but found its admission harmless under the circumstances. The only co-worker who testified was also a close friend of the victim, his testimony was about the victim and his friendship, and the prosecution did not misuse the evidence in closing. *Id*. at 947. The court found that nothing in the victim-impact testimony addressed community impact directly and that the prosecution did not use it as such in its closing argument to the jury. *Id*. at 948. In this case, as in *Fields*, the only co-worker who testified was also a close friend of Hurst's. Sergeant Oliverio testified both about his friendship with Hurst and his own response to Hurst's death. We find no abuse of discretion in the admission of this evidence.

Lawrence maintains that the prosecutor compounded the error by emphasizing the impact of Hurst's death on his co-workers and the community in closing argument. Some of government counsel's closing argument remarks were questionable, suggesting that others, who did not testify, were affected by Hurst's death. Yet, the impact of Hurst's death on co-workers and the community stems largely from the nature of his job as a police officer. It was while acting in this capacity that Hurst was killed. For the most part, government counsel made appropriate use of the facts to illustrate and argue that Hurst was "an individual whose death represents a unique loss to society and in particular to his family." *Payne*, 501 U.S. at 825. Viewed in context, any excess was minimal, its impact insignificant. The evidence of the impact of Hurst's death on people other than his immediate family was therefore not unduly prejudicial. To the extent any particular testimony by Oliverio or argument by government counsel ought to have been disallowed, its admission was ultimately harmless.

**4. Denial of Right to Allocution**

Lawrence contends the district court wrongly denied him his right to allocution in the sentencing phase of trial. Lawrence moved the district court for allocution, relying on the Due Process Clause of the Fifth Amendment and Fed. R. Crim. P. 32(i)(4)(A)(ii). The district court denied the motion, holding, consistent with rulings from the Fourth, Fifth, and Eighth Circuits, that there is no constitutional or statutory right to allocution. Lawrence was free to address the jury under oath and subject to cross-examination, but was not permitted to make an unsworn statement. To complete the record, Lawrence proffered an unsworn written statement that he would have read to the jury had he been permitted to make allocution. The statement consists of three short paragraphs, expressing Lawrence's regret and sorrow for having killed Bryan Hurst and asking for mercy so he might maintain a relationship with his children and positively affect others while in prison.

We review the decision to exclude evidence from the penalty phase for abuse of discretion. *United States v. Lujan*, 603 F.3d 850, 853 (10th Cir. 2010); *United States v. Fell*, 531 F.3d 197, 209, 219–20 (2d Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007). The decision specifically to deny allocution is also reviewed for abuse of discretion. *See United States v. Caro*, 597 F.3d 608, 635 n.24 (4th Cir. 2010); *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005). Whether the denial of allocution violates a constitutional right is a question of law reviewed de novo. *Purkey*, 428 F.3d at 756–57.

The Supreme Court has not expressly recognized a constitutional right to allocution. The circuits that have addressed the question have held there is no constitutional right to allocution before a jury in a federal capital sentencing hearing. *United States v. Jackson*, 549 F.3d 963, 980–81 (5th Cir. 2008), *cert. denied*, 558 U.S. 828 (2009); *United States v. Honken*, 541 F.3d 1146, 1172 (8th Cir. 2008), *cert. denied*, 558 U.S. 1091 (2009); *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000). *See also Goff v. Bagley*, 601 F.3d 445, 464 (6th Cir. 2010) (observing that there is no general right to allocution under the Constitution). In *Boardman v. Estelle*, 957 F.2d 1523, 1525

(9th Cir. 1992), the Ninth Circuit held in a non-capital case that a state court violated the petitioner's due process rights by denying his request to speak to the trial court before sentencing. But *Boardman* does not help Lawrence because, in this capital case, his right to allocution *before the court* prior to sentencing is assured by Fed. R. Crim. P. 32 and was not denied him by the district court. No circuit court of appeals has recognized a constitutional right to allocution before the jury during the sentencing phase of a federal capital trial, and Lawrence has cited no authority that persuades us to become the first circuit to find such a right.

Under Fed. R. Crim. P. 32(i)(4)(A)(ii), dealing generally with sentencing in federal court, "the court," before imposing sentence, is required to "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Rule 32 does not, however, expressly require the district court to permit the defendant to address *the jury* before the jury decides upon a sentence. Enforcing the plain language of Rule 32, most courts have deemed it satisfied in a federal capital case—where the jury renders its verdict recommending a sentence of death or life imprisonment, but the court is required by 18 U.S.C. § 3594 to actually impose the sentence in accordance with the verdict—if the court allows the defendant to speak to the court before the sentence is actually imposed. *Honken*, 541 F.3d at 1172; *Barnette*, 211 F.3d at 820; *United States v. Hall*, 152 F.3d 381, 392–93 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000). Consistent with these authorities, we hold that Rule 32 does not confer a right to allocution before the jury in a capital case in the form of an unsworn statement not subject to cross-examination.

Under the FDPA's sentencing scheme, however, "[t]he defendant may present any information relevant to a mitigating factor." 18 U.S.C. § 3593(c). The information need not be admissible under the rules of evidence, but "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* Irrespective of whether he had a constitutional or statutory right to allocution, Lawrence contends the district court ought to have permitted his

proffered allocution as information relevant to mitigation. Several district courts have taken this approach and exercised their discretion to permit allocution. *See*, *e.g.*, *United States v. Wilson*, 493 F. Supp. 2d 509, 510–11 (E.D. N.Y. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 846 (S.D. Ohio 2007). Indeed, allowing allocution "to mitigate the sentence" only before the court, which has no discretion and is obliged to impose sentence in accordance with the jury's recommendation, would seem to be an "empty formality." *Wilson*, 493 F. Supp. 2d at 511; *Henderson*, 485 F. Supp. 2d at 846. Further, although the FDPA does not mention allocution, the probative value of the sound of the defendant's own voice, explaining his conduct and subsequent remorse in his own words, as information relevant to mitigation, can hardly be gainsaid. *See Green v. United States*, 365 U.S. 301, 304 (1961) ("The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.")

Yet, § 3593(c) also recognizes the district court's discretion to exclude information if its probative value is outweighed by the danger of unfair prejudice. *See Caro*, 597 F.3d at 635 n.24; *Bolden*, 545 F.3d at 628. In *Wilson* and *Henderson*, the courts permitted allocution, but only subject to defined conditions and limitations.

Here, the district court did not allow allocution, but did not deny Lawrence the right to make a statement before the jury under oath and subject to cross-examination. Lawrence chose not to personally address the jury under these constraints, but he has not identified any unfairness inherent in the district court's requirement that any statement be made under oath. Lawrence presented extensive mitigation evidence, spanning four days. The mitigation witnesses who testified told of Lawrence's remorse, acceptance of responsibility, opportunities for rehabilitation, and family ties, and Lawrence's counsel introduced into evidence a journal in which Lawrence apologized for killing Hurst, expressed love for his children, and said that he was willing to spend his life in prison.

Considering the record as a whole, Lawrence has failed to show that the district court abused its discretion by denying allocution. The district court applied the correct

legal standards in exercising its discretion. The court did not explicitly identify the unfair prejudice that was deemed to outweigh the probative value of Lawrence's proffered unsworn statement. Yet, considering the extent of Lawrence's mitigation case and the contents of his short unsworn statement, the court could well have concluded that the probative value of the statement was limited and cumulative. We are not left with a definite and firm conviction that the trial court committed a clear error of judgment in this regard and therefore find no abuse of discretion in the disallowance of allocution. *See United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011).[2]

### 5. Improper Imposition of Death Sentence

Lawrence was found guilty under Count Seven of violating 18 U.S.C. § 2113 by attempting to commit bank robbery and killing a person in the process. The statute prescribes life imprisonment or death as possible penalties. 18 U.S.C. § 2113(e). Lawrence was found guilty under Count Eight of carrying a firearm during and in relation to attempted armed bank robbery and committing murder. 18 U.S.C. § 924(c), (j)(1). This offense is subject to punishment "by death or by imprisonment for any term of years or for life, . . . [e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law." *Id.* In his fifth claim of error, Lawrence contends that because § 924(c)(1)(A) calls for sentencing under the provision with the greater minimum sentence, he should have been sentenced only under the penalty provisions applicable to the Count Seven offense, under which he was subject to a mandatory minimum sentence of life imprisonment and was sentenced to life. For support, Lawrence relies on *United States v. Almany*, 598 F.3d 238 (6th Cir.), *vacated*, 131 S. Ct. 637 (2010). In *Almany*, § 924(c)(1)(A) was interpreted literally to exempt a criminal defendant from its mandatory minimum sentence if he was subject to *any* other greater mandatory minimum sentence. *Id.* at 241–42.

---

[2]Even if we might prefer that allocution had been allowed, and even if its disallowance were deemed to lack substantial justification, we would nonetheless be satisfied that any error was harmless under the circumstances. *See* 18 U.S.C. § 3595(c)(2)(C).

*Almany*'s reasoning was rejected in *Abbott v. United States*, 131 S. Ct. 18 (2010), as the Supreme Court vacated our decision in *Almany* and remanded for further consideration in light of *Abbott*.  Pursuant to *Abbott*, the "except" clause of § 924(c)(1)(A) refers only to provisions mandating a greater minimum sentence *for use of a firearm* in connection with a predicate crime.  *Abbott*, 131 S. Ct. at 26.  On remand in *Almany*, we restored the sentence that had been originally imposed under § 924(c). *United States v. Almany*, 626 F.3d 901 (6th Cir. 2010).

The original *Almany* decision is thus no longer good law, and Lawrence's argument fails.  Because the penalty provision applicable to the Count Seven offense, 18 U.S.C. § 2113, does not prescribe a mandatory minimum sentence of life imprisonment *for use of a firearm*, it does not come within the reach of the § 924(c)(1)(A) "except" clause and does not restrain operation of the § 924(j) penalty provision applicable to the Count Eight offense under which he was sentenced to death. We thus reject Lawrence's fifth claim of error.

### 6.  Arbitrary Imposition of Death Sentence

Lawrence contends that imposition of the death sentence on Count Eight was arbitrary and therefore violated the Eighth Amendment and the FDPA.  He bases this claim on the fact that six jurors found, as one of fifty-one mitigating factors considered, that a sentence of life without parole is an appropriate and sufficient punishment, but nonetheless voted to sentence him to death.  Lawrence contends this inconsistency can only be explained as the product of arbitrariness or confusion.

Under the FDPA, we are required to remand the case for reconsideration or imposition of a sentence other than death upon finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. 18 U.S.C. § 3595(c)(2).  Arbitrary imposition of the death penalty violates the Eighth Amendment.  *See Gregg v. Georgia*, 428 U.S. 153, 188 (1976);  *Smith v. Mitchell*, 567 F.3d 246, 263 (6th Cir. 2009); *Getsy v. Mitchell*, 495 F.3d 295, 304 (6th Cir. 2007).

The FDPA requires a higher standard of proof for aggravating factors than mitigating ones.  The prosecution must establish the existence of an aggravating factor beyond a reasonable doubt, and the jury must agree unanimously.  18 U.S.C. § 3593(c).  The defendant need only establish the existence of a mitigating factor by a preponderance of the evidence.  *Id.*  If one juror finds that the defendant established the existence of a mitigating factor, all jurors may consider that mitigating factor in the weighing process.  18 U.S.C. § 3593(d); *Louis Jones v. United States*, 527 U.S. 373, 377 (1999).  However, jurors are not required to find any particular factor mitigating nor to give it any particular weight.  *United States v. Basham*, 561 F.3d 302, 337 (4th Cir. 2009); *United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000).  Under the FDPA, the jury exercises complete discretion in its determination of whether the aggravating factors outweigh the mitigating factors.  *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Allen*, 247 F.3d 741, 781 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).  "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  *Tuilaepa v. California*, 512 U.S. 967, 979 (1994).  As the district court instructed the jury and as this court noted in the prior appeal, "the weighing of mitigating and aggravating circumstances is not to be 'a mechanical process.'  Rather, the factors should be considered 'qualitatively' and the decision 'must be a reasoned response.'"  *Lawrence*, 555 F.3d at 265 n.4.  "'The weighing is not numeric; the perceived significance, not the number, of aggravating and mitigating factors determines the decision.'"  *United States v. Davis*, 609 F.3d 663, 673 (5th Cir. 2010) (quoting *Louis Jones*, 527 U.S. at 408 (Ginsburg, J., dissenting)).

Lawrence's focus on individual jurors' findings on a single mitigating factor distorts the overall picture of the jury's verdict on Count Eight.  In the eligibility phase of Lawrence's trial, the jury unanimously found that the government proved, beyond a reasonable doubt, two statutory aggravating factors:  (1) Lawrence killed Hurst in the commission of an attempted armed bank robbery or in escaping apprehension for such offense and knowingly created a grave risk of death to one or more persons in addition to Hurst; and (2) Lawrence killed Hurst in expectation of the receipt of anything of pecuniary value.  In the sentencing phase, the jury unanimously found that the

government proved, beyond a reasonable doubt, two non-statutory aggravating factors: (1) Lawrence committed three other bank robberies armed with a firearm, wearing a mask, and making threats to victims within a year of the commission of the capital crimes; and (2) the capital crimes committed by Lawrence caused harm to Hurst's family members, friends, and community members.

As for the mitigating factors, on Count Eight, the jurors cumulatively made a total of 304 mitigating factor findings, including two mitigating factors that were not on Lawrence's list of forty-nine. While six jurors found that Lawrence's proposed mitigating factor—"[l]ife in prison without the possibility of parole is an appropriate and sufficient punishment"—had been established, six did not and were under no obligation to consider it. Even the jurors who did find the mitigating factor established were not obliged to conclude that all the aggravating circumstances failed to outweigh all the mitigating factors. The jurors who found the mitigating factor established also found the aggravating factors established, and by a higher standard of proof. It was not arbitrary for the jury to decide that the aggravating factors outweighed the mitigating factors.

Lawrence contends that the six jurors' findings that life imprisonment is "an appropriate and sufficient punishment" was a "binding vote," preclusive of each of those six jurors' prerogative to ultimately find the mitigating factors outweighed by the aggravating factors. This construction is at odds with the jury instructions, which defined "mitigating factor" as "simply additional information about Daryl Lawrence's life or character, or about the circumstances surrounding the offense, that would suggest, in fairness and mercy, that a sentence of death is not the *most appropriate* punishment, and that a sentence of life in prison without any possibility of release is the *more appropriate* punishment." R. 213, Sentencing Instructions at 29, Page ID # 1684 (emphasis added). Thus, as explained in our earlier ruling, a juror's finding that a mitigating factor was established simply represents his or her determination that Lawrence demonstrated the existence of the factor by a preponderance of the evidence and that the factor had mitigating weight to be balanced against aggravating factors. *Lawrence*, 555 F.3d at 267. Far from being a binding vote, a juror's finding of a

mitigating factor—even that life imprisonment is *an* appropriate punishment—simply means the factor could be considered by the jury in deciding whether a sentence of death was not the *most* appropriate punishment and whether life imprisonment was *more* appropriate.

Lawrence has not identified an error in the district court's instructions, and our review of the record shows that the court properly set out the burdens of proof, told the jurors what they could consider as they weighed the sentence, and advised them that the weighing process was not a mechanical process. There is no indication that the jurors failed to understand or follow the court's instructions. Indeed, their detailed findings with respect to the mitigating factors suggests that they took their duty seriously. Lawrence's argument that the Count Eight sentence is arbitrary is unfounded and his speculation about jurors' thought processes is unsubstantiated and unavailing. As we observed in our earlier ruling, "[t]o the extent the differences in the jurors' mitigation findings remain unexplained and may give rise to speculation, the fact remains that there is no evidence that any arbitrary factor 'most likely' influenced the bottom line verdicts." *Id.* at 268. We therefore reject Lawrence's claim that the sentence of death was arbitrarily imposed.

### 7. "Pecuniary Gain" Statutory Aggravating Factor

Lawrence contends the district court erred by improperly permitting the jury to consider pecuniary gain as a statutory aggravating factor in relation to the Count Seven and Count Eight offenses because pecuniary gain was not expected to follow as a direct result of the murder. Lawrence challenged the pecuniary gain factor by moving to strike it from the indictment prior to trial and by filing a motion for judgment of acquittal under Fed. R. Crim. P. 29 at the close of the government's case in chief. The district court denied both motions. We now address the legal sufficiency of the indictment; to the extent Lawrence challenges the evidentiary support for the charged aggravating factor, his arguments are addressed below in connection with Claim 9.

We review the sufficiency of the indictment de novo. *United States v. Damra*, 621 F.3d 474, 506 (6th Cir. 2010). Statutory interpretation is a matter of law also reviewed de novo on appeal. *Batti*, 631 F.3d at 375; *see also Bolden*, 545 F.3d at 616 (holding that a district court's interpretation of a statutory aggravating factor is reviewed de novo). A criminal indictment is facially valid if it: "(1) contains the elements of the offense charged, (2) fairly informs a defendant of the charge against which he must defend and (3) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Titterington*, 374 F.3d 453, 456 (6th Cir. 2004) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (interior quotation marks omitted). An indictment need not anticipate affirmative defenses or exceptions. *Id.*

Count Seven of the indictment charged that Lawrence attempted to rob a bank, put employees' lives in jeopardy with a handgun, and killed Hurst in committing attempted robbery or attempting to avoid apprehension. Count Eight charged that Lawrence used and discharged a firearm during the attempted armed robbery and murdered Hurst in the attempt to perpetrate robbery. The indictment further alleged, per the grand jury's special findings, in relation to Counts Seven and Eight, that Lawrence committed murder during the perpetration of attempted bank robbery in the expectation of the receipt of anything of pecuniary value, a statutory aggravating factor under 18 U.S.C. § 3592(c)(8).

On its face, the indictment contains the elements of the pecuniary gain aggravating factor and informed Lawrence of the charges against which he had to defend. Lawrence argues, however, that this aggravating factor is not applicable unless the alleged murder itself was committed for pecuniary gain. It is not enough, he contends, that the attempted bank robbery was in expectation of receiving pecuniary gain. Lawrence is right. Although the § 3592(c)(8) pecuniary gain factor does not apply only to murders-for-hire, it may apply to a killing in the course of a bank robbery only where pecuniary gain was expected to follow as a direct result of the murder. *See Bolden*, 545 F.3d at 615 (collecting cases).

Yet, the offense conduct alleged in the instant indictment is broad enough to encompass conduct within the grand jury's "pecuniary gain" special finding, as interpreted in the case law. The indictment alleged that Lawrence murdered Hurst in the attempt to perpetrate robbery. Thus, the indictment sufficiently charged that Lawrence expected pecuniary gain as a direct result of murdering Hurst. We find no error in the district court's refusal to strike the pecuniary gain factor from the indictment.

### 8. Improper Admission of "Lifestyle Evidence"

Lawrence contends the district court erred by allowing the government to introduce evidence about Lawrence's lavish lifestyle as proof of motive because it was irrelevant to proving the pecuniary gain factor and was overwhelmingly prejudicial. The government responds that the evidence was relevant because it established a pattern in the timing of the robberies, explained why the robberies became increasingly violent, and rebutted Lawrence's claim that he did not intend to kill Hurst and was not trying to get to the bank vault when he fired at Hurst.

We review evidentiary rulings for abuse of discretion. *Boyd*, 640 F.3d at 668. "The evidence must be viewed 'in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) (quoting *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002)). Under 18 U.S.C. § 3593(c), the government may present any information relevant to an aggravating factor unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." The trial court's "'discretion in balancing the probative value of evidence against its potential for unfair prejudice is very broad.'" *United States v. Deitz*, 577 F.3d 672, 689 (6th Cir. 2009) (quoting *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999)). Under the FDPA, reversal is required only if the government cannot establish beyond a reasonable doubt that the error was harmless. 18 U.S.C. § 3595(c)(2)(C); *Lighty*, 616 F.3d at 363.

The district court addressed this issue before trial and during the eligibility phase. The government indicated that it intended to introduce evidence about Lawrence's

spending habits and previous bank robberies to establish motive, intent, and the pecuniary gain aggravating factor.  The district court concluded that the evidence was relevant to Lawrence's motive and intent because he maintained that he did not shoot Hurst intentionally, and that the probative value of the evidence was not sufficiently outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  The district court also overruled Lawrence's objections at trial.

During the guilt phase of trial, the government introduced evidence that Lawrence robbed three banks between January and September 2004 and attempted to rob a bank in January 2005.  The jury convicted Lawrence of the robberies, the attempted robbery, and related charges, as well as Counts Seven and Eight.  During the eligibility phase, the government sought to prove the pecuniary gain aggravating factor, one other statutory aggravating factor, and at least one of the four statutory intent factors.  18 U.S.C. § 3591(a)(2).  The government presented three witnesses.  Two were friends of Lawrence who testified about trips they took with him.  The third was a police detective who testified about his attempts to trace the proceeds of Lawrence's bank robberies.  The evidence showed that Lawrence stole $200,000 in the first bank robbery.  Shortly thereafter, he took two trips to Los Angeles with friends and spent money on expensive hotel rooms, luggage, tickets to professional basketball games, limousines, jewelry, and night clubs.  He also bought two vehicles at a total cost of about $37,000.  A month before the second bank robbery, Lawrence pawned jewelry and luggage.  The second robbery yielded $7,000 and the third, $80,000.  After the third robbery, he reclaimed the items he had pawned.  Shortly before the fourth robbery, Lawrence pawned personal possessions and his vehicles.

Evidence as to why Lawrence wanted money and how he spent it is not irrelevant to the pecuniary gain aggravating factor under the circumstances of this case.  The pecuniary gain aggravating factor only applies where pecuniary gain is expected to follow as a direct result of the murder.  *Bolden*, 545 F.3d at 615.  All robberies are for pecuniary gain; many murders are not.  In *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002), evidence of a defendant's lavish lifestyle was deemed

admissible where there was other credible evidence of illegal activity, the money was not available from a legitimate source, and the periods of wealth or spending correlated with the periods of alleged illegal activity. Under these circumstances, the evidence was deemed relevant to both demonstrate motive and support an inference that the defendant committed the crime. *Id.*

Here, in evaluating whether the pecuniary gain factor was proven, the jury had to determine whether Lawrence shot Hurst in order (a) to remove an obstacle to the attempted bank robbery, or (b) to abort the bank robbery attempt and secure his escape. If the jury were to find the former, then the pecuniary gain factor would have been established; if the latter, then the pecuniary gain factor would not have been established. The government's purpose in introducing the lavish lifestyle evidence was to show that Lawrence had become accustomed to certain pleasures that money could buy. Having learned from earlier robberies that his chances of making a big haul from a robbery were enhanced if he gained access to the bank vault, the government argued that Lawrence's now accustomed lifestyle drove him to threaten or use violence to reach the vault. The lifestyle evidence was thus offered to help explain the avarice that motivated Lawrence to commit the bank robberies. The government contended the jury could infer from the lifestyle evidence that when Hurst became an obstacle, Lawrence, driven by the compulsion of his spending habits, used deadly force to remove Hurst in expectation of a greater take from the vault. The government contends this inference is supported by other facts as well, arguing that Lawrence did not abort the robbery immediately after firing at Hurst, but only after Hurst returned fire and wounded him.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Evidence of the specific reason for which Lawrence wanted money badly enough to commit several bank robberies does have some tendency to explain the motivation for Lawrence's conduct and could be considered by a rational jury to make it more probable that Lawrence shot Hurst in order to complete the robbery rather than solely to facilitate his escape. The government proved that Lawrence entered a bank armed with a loaded weapon, pushed

his way past customers at the entrance, rushed the teller counter with handgun drawn and aimed, and shot Hurst as he drew his weapon. Lawrence fled the bank only after Hurst returned fire and wounded him. There was evidence that Lawrence obtained substantially more money from the bank robberies in which he reached the vault, instead of settling for what he could take from a bank teller. This evidence could have been viewed as shedding light on Lawrence's motivation for shooting Hurst. We thus find no error in the district court's determination that the lifestyle evidence had probative value.

Lawrence maintains that any probative value was outweighed by the danger of unfair prejudice. He contends the lifestyle evidence was likely to appeal to the jurors' economic prejudices, triggering resentment and envy. He argues the evidence would tend to give rise to inferences that Lawrence was shallow, materialistic and of poor moral character. We acknowledge that the probative value of the lifestyle evidence to show Lawrence's motive for shooting Hurst was marginal. We reject the notion, however, that the lifestyle evidence was unfairly prejudicial. The jury had, in the guilt phase, just unanimously found beyond a reasonable doubt that Lawrence was guilty of committing three armed bank robberies and attempting a fourth, and of having killed Hurst during the course of the attempted bank robbery. Any tendency of the evidence of Lawrence's profligate spending habits to impugn his moral character pales in comparison with the depravity reflected in the conduct of which the jury had already found him guilty. Lawrence has not shown that the evidence's probative value was substantially outweighed by the danger of unfair prejudice.

Accordingly, the district court did not abuse its discretion by admitting the lifestyle evidence.

### 9. Sufficiency of Evidence of Pecuniary Gain Motivation

Lawrence contends the government did not present sufficient evidence to support a finding, beyond a reasonable doubt, that he expected to gain something of pecuniary value by killing Hurst. Lawrence maintains that he was surprised to see an officer in the bank, that he fired shots to prevent Hurst from shooting him, that Hurst was not near the bank vault, that he was in the bank for only around twenty seconds, and that after

reaching the teller counter, he left the bank without continuing to the vault or taking anything from a teller drawer.

We review jury findings of aggravating factors under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Viewing the evidence in the light most favorable to the government, we must uphold the verdict if any rational trier of fact could have found the existence of the aggravating factor beyond a reasonable doubt. *See Bolden*, 545 F.3d at 615; *United States v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006).

Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to support the jury's finding of the pecuniary gain aggravating factor. Testimony about the earlier bank robberies indicated that Lawrence brandished a gun at each one. In the first robbery, he held employees at gunpoint, went behind the teller counter, and forced employees to open the vault. Lawrence left with over $200,000. He threatened to shoot people during the second and third robberies. In the second robbery, Lawrence attempted to force employees to open the vault but did not succeed. He left with around $7,000. During the third robbery, he held a gun to a bank employee's head to force him to open the vault, shoved him to the floor once the vault was open, and fired a shot that grazed the employee's foot. Lawrence took around $80,000 from that bank. This history demonstrates Lawrence's willingness to use threats of deadly force to get what he wanted.

As for the attempted robbery, a bank employee testified that Lawrence entered the bank with a cocked semi-automatic weapon and forced him and two other employees back into the bank from the vestibule. One of these employees testified that she first heard shots coming from behind her, where Lawrence was. Another one of the group of three, an office manager, testified that Lawrence was close behind her when she heard the first shot fired, on the right side of her ear. A teller behind the teller counter testified that she saw an arm with a gun come over the top of the counter as Hurst, from behind the counter, was trying to unholster his weapon. She testified that Lawrence shot Hurst before Hurst pulled his gun from his holster. A witness testified that at least one of the shots Lawrence fired at Hurst was from close range, two to three feet. From this

testimony, although the witnesses were not entirely consistent, a reasonable juror could find that Lawrence entered the bank armed with a loaded weapon, ran toward the teller counter, encountered Hurst, and shot him in order to take money from the bank—thus killing Hurst in expectation of pecuniary gain.

From the bank security camera videotape evidence, which shows Lawrence but not Hurst, we know that the actual exchange of gunfire was fast and furious, occupying less than five seconds. The videotape does not definitively disclose who fired first. Nor does it disclose whether Lawrence fired the fatal shot before he was struck by shots fired by Hurst or whether Lawrence began his retreat immediately after firing at Hurst or only after being wounded. It does not disclose Lawrence's thoughts at the moment he fired at Hurst. Lawrence clearly had no time to deliberate after first seeing Hurst and realizing that he was armed. Lawrence reacted instantaneously. It is for this reason that the history of Lawrence's prior bank robberies and evidence of his lifestyle was probative of Lawrence's state of mind as he entered the bank. Although there is no evidence that Lawrence attempted to complete the robbery after he was shot, a rational juror could have reasonably concluded that he fled the bank because he was wounded, not because his encounter with and shooting of Hurst alone had deterred him from completing the robbery.

In other words, considering all the evidence in the light most favorable to the government, we conclude that a rational juror reasonably could have found that Lawrence, when he fired the fatal shot, still harbored hope and expectation of completing the robbery. This is sufficient to sustain the finding of the pecuniary gain factor.

Decisions of other courts faced with analogous evidence support this conclusion. In *Bolden*, the defendant encountered and struggled with the bank guard even before entering the bank. The defendant fired two shots which claimed the guard's life. Immediately after firing the shots, the defendant fled the scene. The Eighth Circuit rejected the defendant's argument that there was insufficient evidence that he killed the bank guard in expectation of pecuniary gain rather than to eliminate a witness and escape from a botched robbery. The court found that because the defendant brought a loaded

gun to a bank and was disappointed that he did not complete the bank robbery, there was sufficient evidence for a reasonable jury to find that he shot the victim to remove an obstacle and complete the robbery. *Bolden*, 545 F.3d at 615–16.

In *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the defendant stabbed a postal worker repeatedly and took money orders. It was unclear how many of the stab wounds had been inflicted before the defendant gained control of the money orders. The Eleventh Circuit found that there was sufficient evidence of pecuniary gain motivation, reasoning that "the jury could reasonably have found that [the defendant] killed [the victim] before he had control of the money orders, and that the killing was necessary so that [the defendant] could complete the robbery (which, obviously, carried with it the expectation of pecuniary gain)." *Id*. at 1371.

In *United States v. Barnette*, 390 F.3d 775, 807–08 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005), the defendant testified that, on the night of the crime, he wanted a car to drive from North Carolina to Virginia and planned to carjack somebody. He hid near an intersection waiting for a motorist to stop, confronted the driver of a stopped vehicle, forced the driver from the car at gunpoint, walked him across a highway, robbed him and then killed him before driving off in the car. Despite the defendant's testimony that he shot the victim "for no damn reason,"—"just being a damn idiot," the Fourth Circuit concluded that there was sufficient evidence for the jury to conclude that the defendant killed the victim in expectation of receiving something of pecuniary value, namely, the victim's money and transportation to Virginia. *Id*. at 808.

Consistent with these authorities, and upon review of the evidence in the light most favorable to the government, we reject Lawrence's challenge to the sufficiency of the evidence supporting the finding of pecuniary gain motivation.

### 10. "Grave Risk of Death" Statutory Aggravating Factor

Lawrence contends the "grave risk of death" aggravating factor set forth in 18 U.S.C. § 3592(c)(5) should not have been applied in this case because it did not serve

to narrow the class of death-eligible defendants and unfairly skewed the weighing of aggravating and mitigating factors. Lawrence moved the district court to strike the grave-risk-of-death aggravating factor both prior to trial and at the close of the government's proofs in the eligibility phase. He maintained that the factor duplicated the "put in jeopardy the life of employees" element of Count Seven and, by incorporation, Count Eight, and therefore failed to narrow the class of individuals eligible for the death penalty, in violation of the Fifth and Eighth Amendments. The district court denied both motions.

Lawrence's constitutional challenge to the statutory aggravating factor is reviewed de novo. *See Caro*, 597 F.3d at 622; *Purkey*, 428 F.3d at 761. There are two stages in the capital sentencing decision making process: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971. A defendant is rendered eligible for the death penalty in a homicide case upon a finding by the jury or judge that the defendant is guilty of murder and the finding of one aggravating circumstance at either the guilt or penalty phase. *Id.* at 971–72; *Lowenfield v. Phelps*, 484 U.S. 231, 244–246 (1988). "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Tuilaepa*, 512 U.S. at 972 (citing *Lowenfield*, 484 U.S. at 244–46). The aggravating circumstance is subject to two limitations. First, it "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Id.* (citing *Arave v. Creech*, 507 U.S. 463, 474 (1993)). Second, the aggravating circumstance may not be unconstitutionally vague. *Id.* Thus, as long as the "narrowing function" of the aggravating circumstance is not impermissibly vague and is incorporated into the capital sentencing scheme, whether in the guilt phase or the eligibility phase, the process is not constitutionally infirm. *Lowenfield*, 484 U.S. at 246.

In *Lowenfield*, the jury found the defendant guilty of three counts of murder, finding him eligible for the death penalty because he had the specific intent to kill or inflict great bodily harm upon more than one person. The sole aggravating circumstance found and considered by the jury in returning the sentence of death was that "the

offender knowingly created a risk of death or great bodily harm to more than one person." Yet, though "the aggravating circumstance duplicated one of the elements of the crime," the Court held the sentence was not constitutionally infirm, because the required narrowing function of the aggravating circumstance was performed, albeit twice. *Id.*; *see also Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001).

In this case, Count Seven alleged that Lawrence put in jeopardy the lives of bank employees by means and use of a dangerous weapon (18 U.S.C. § 2113(d)), and killed Hurst in attempting to commit a bank robbery or avoid apprehension (§ 2113(e)). Section 2113(d) authorizes twenty-five years' imprisonment and § 2113(e) authorizes a sentence of death. Count Eight alleged that Lawrence murdered Hurst with malice aforethought in the attempt to perpetrate a robbery (18 U.S.C. § 924(j)(1)). Count Eight expressly incorporated Count Seven. Section 924(j)(1) provides that the penalty for violating § 924(c) and committing murder is death or imprisonment for life or a term of years.

The statutory aggravating factor at issue provides that, in determining whether a death sentence is justified, the jury shall consider whether the defendant knowingly created a grave risk of death to one or more persons in addition to the victim while committing or escaping apprehension for the death-eligible offense. 18 U.S.C. § 3592(c)(5). In the guilt phase, the jury found Lawrence guilty of all counts in the indictment and, specifically in relation to Count Seven, found that Lawrence "put in jeopardy the life of some person by the use of a dangerous weapon while engaged in attempting to take money." In the eligibility phase, in relation to Count Seven, the jury found that Lawrence "knowingly created a grave risk of death to one or more persons in addition to Bryan Hurst."

Lawrence does not challenge the aggravating factor on vagueness grounds. He contends the grave-risk-of-death statutory aggravating factor failed to perform a narrowing function because it did not narrow the class of offenders eligible for the death penalty, but merely duplicated the "put in jeopardy" element of Count Seven. First, the claim is mistaken as a factual matter. The only offenses in the indictment punishable by

death were violations of 18 U.S.C. § 2113(e) and § 924(j)(1). The jury's finding that Lawrence put someone's life in jeopardy in violation of § 2113(d) did not make him eligible for the death penalty, so the fact that the § 3592(c)(5) grave-risk-of-death aggravating factor may have overlapped with § 2113(d) under the facts of this case is of no consequence.

Second, Lawrence's claim fails as a matter of law. The FDPA narrows the class of defendants eligible for the death penalty by requiring the jury to find that the defendant had the requisite intent under 18 U.S.C. § 3591 and at least one statutory aggravating factor under 18 U.S.C. § 3592(c). *Lighty*, 616 F.3d at 368 n.44; *Allen*, 247 F.3d at 761. Lawrence was eligible for the death sentence by virtue of the jury's findings that he committed offenses under 18 U.S.C. §§ 924(j)(1) and 2113(e), that he had the requisite intent under 18 U.S.C. § 3591(2), and that the government proved two statutory aggravating factors, grave risk of death and pecuniary gain. 18 U.S.C. § 3592(c)(5), (8). The FDPA in general and Lawrence's prosecution in particular satisfy the requirement that the aggravating circumstance cannot apply to every defendant eligible for the death penalty. *See Arave*, 507 U.S. at 474. The use of the grave-risk-of-death aggravating factor along with the "put in jeopardy" element of 18 U.S.C. § 2113(d) did not violate Lawrence's constitutional rights. Our sister circuits have rejected similar challenges to aggravating factors under the FDPA. *See Lighty*, 616 F.3d at 368 n.44; *United States v. Higgs*, 353 F.3d 281, 315–16 (4th Cir. 2003); *United States v. McCullah*, 76 F.3d 1087, 1109–10 (10th Cir. 1996).

Lawrence cites *United States v. McVeigh*, 944 F. Supp. 1478, 1489–90 (D. Colo. 1996), for the proposition that allowing the jury "to weigh as an aggravating factor a crime already proved in a guilty verdict would unfairly skew the weighing process in favor of death." The *McVeigh* ruling is summary in nature and unpersuasive. It has been soundly rejected by other courts. *See United States v. Mayhew*, 380 F. Supp. 2d 936, 947 (S.D. Ohio 2005) (collecting cases and objecting to notion of asking jury to sentence defendant without considering the crime itself ); *United States v. Lentz*, 225 F. Supp. 2d 666, 669–70 (E.D. Va. 2002) (noting there is nothing wrong with permitting

jury to consider crimes for which defendant was found guilty beyond a reasonable doubt in determining appropriate sentence); *United States v. Llera Plaza*, 179 F. Supp. 2d 464, 484 (E.D. Pa. 2001) (noting that *McVeigh* seems to contravene the holding of *Lowenfield*).

Accordingly, we reject Lawrence's challenge to the grave-risk-of-harm aggravating factor.

**11. Prosecutorial Discretion to Charge Non-Statutory Aggravating Factors**

Lawrence contends that the FDPA, 18 U.S.C. § 3592(c), by giving counsel for the government unbridled discretion to propose and argue for jury consideration of non-statutory aggravating factors, makes an unconstitutional delegation of legislative authority. The district court denied Lawrence's motion to strike the noticed non-statutory aggravating factors—i.e., contemporaneous findings of guilt and victim impact evidence. Lawrence's constitutional challenge is reviewed de novo. *See Harold Jones*, 641 F.3d at 713.

Under the non-delegation doctrine, Congress cannot delegate its legislative power to another branch of government. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). However, Congress can seek assistance from coordinate branches. *Id*. at 372. In doing so, it must provide "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id*. (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (alteration in original). Lawrence contends it is the role of Congress to define crimes and punishments and that permitting the government to select non-statutory aggravating factors without limit or guidance violates the non-delegation principle. He contends the FDPA lacks any intelligible principle and gives prosecutors extensive and unconstrained power to determine what factors will be used in a particular capital case.

Like all other courts that have considered this argument, we reject Lawrence's challenge. First, the express recognition in § 3592(c) of the sentencer's freedom to consider non-statutory aggravating factors is hardly a delegation of legislative power.

*See Higgs*, 353 F.3d at 321–22; *United States v. Louis Jones*, 132 F.3d 232, 239–40 (5th Cir. 1998). Second, the FDPA sentencing scheme includes various limits on non-statutory aggravating factors, such as requiring that prior notice be given to the defendant, 18 U.S.C. § 3593(a); giving the district court "gatekeeper" responsibility for limiting admission of unfairly prejudicial information, 18 U.S.C. § 3593(c); and requiring that the jury find at least one intent element and one statutory aggravating factor before considering any non-statutory factor, 18 U.S.C. § 3593(d). These safeguards have been deemed sufficient to limit the prosecutor's power and render the delegation of discretion to charge non-statutory aggravating factors constitutional. *See e.g.*, *United States v. Mitchell*, 502 F.3d 931, 979 (9th Cir. 2007); *Higgs*, 353 F.3d at 321–22 ; *United States v. Paul*, 217 F.3d 989, 1003 (8th Cir. 2000); *Louis Jones*, 132 F.3d at 239–40. Lawrence cites no persuasive authority to the contrary. Accordingly, we find no error in the district court's denial of the motion to strike the non-statutory factors on this ground.

### 12. Failure to Charge Non-Statutory Aggravating Factors in Indictment

Lawrence argues that the Fifth Amendment's Indictment Clause requires the government to present non-statutory aggravating factors to the grand jury. He reasons that because a jury in an FDPA case can choose the death sentence only if it finds that both statutory and non-statutory aggravating factors outweigh the mitigating factors, both statutory and non-statutory aggravating factors must be found by the grand jury. The district court denied Lawrence's motion to strike the notice of intent to seek the death penalty. We review de novo.

The Indictment Clause of the Fifth Amendment requires that a defendant be charged with only those charges brought before the grand jury. In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Court held that an aggravating factor necessary for imposition of the death penalty must be found by the jury, not by the sentencing judge. After *Ring*, several courts have held that an indictment charging a death-eligible offense under the FDPA must charge the statutory aggravating factors. *See Brown*, 441 F.3d at 1367; *United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005); *United States v.*

*Allen*, 406 F.3d 940, 942–43 (8th Cir. 2005); *Higgs*, 353 F.3d at 297–98; *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2d Cir. 2002). However, all five circuits that have considered whether non-statutory aggravators under the FDPA must be submitted to a grand jury and charged in the indictment have concluded that they do not. *See United States v. Fell*, 531 F.3d 197, 236–38 (2d Cir. 2008); *United States v. LeCroy*, 441 F.3d 914, 922 (11th Cir. 2006); *Purkey*, 428 F.3d at 749–50; *Bourgeois*, 423 F.3d at 507–08; *Higgs*, 353 F.3d at 298. These courts have reasoned that only those factors necessary to make a defendant eligible for the death penalty—intent and a statutory aggravating factor—must be included in the indictment. Non-statutory aggravating factors are relevant considerations in the sentence *selection* decision, but do not, in themselves, determine whether a defendant is "eligible" to be considered for the death sentence. *See Tuilaepa*, 512 U.S. at 971–73 (explaining differences between eligibility decision and selection decision in the capital decision making process). Lawrence has not identified any contrary authority, and we find the reasoning of our sister circuits sensible and persuasive. We therefore join them in holding that non-statutory aggravating factors need not be charged in the indictment to satisfy the Fifth Amendment's Indictment Clause.

### 13. Sufficiency of Evidence to Justify Death Penalty

Lawrence contends the evidence presented at sentencing was insufficient to support the jury's finding that the aggravating factors sufficiently outweighed the mitigating factors to justify death in relation to Count Eight. Under 18 U.S.C. § 3595(c)(1), we must address all substantive and procedural issues raised on appeal of a death sentence and consider "whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor" and whether the evidence supports the special finding of the existence of any required statutory aggravating factor. We review the record to determine not only whether the jury's decision is supported by the evidence, but also whether there is evidence of improper influence. "While death penalty proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless." *Lighty*, 616 F.3d at 369 (quoting *Higgs*, 353 F.3d

at 333 (internal alterations omitted)).  A sentence of death can be vacated only upon a "finding" that passion, prejudice, or an arbitrary factor most likely influenced the sentence.  *Id.*; *Agofsky*, 458 F.3d at 373.  Speculation is insufficient to show arbitrary influence; there must be some basis for concluding that emotion rather than reason swayed the jury.  *Id.* at 373–74; *Higgs*, 353 F.3d at 333.

Among the factors we consider are the following:  whether the jury was properly instructed to base its sentencing decision on the evidence and avoid the influence of passion, prejudice and arbitrary factors; whether sufficient evidence supported the aggravating factors; whether the jury's verdict indicates that it considered the evidence dispassionately; and whether the trial was conducted fairly.  *See Basham*, 561 F.3d at 338.  A determination that the jurors employed the process they were instructed to apply in selecting the sentence will defeat a claim of arbitrariness.  *See Paul*, 217 F.3d at 1004–05.

Under the FDPA, when determining whether to impose the death sentence, the jury shall consider the "defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).  The statute also lists specific mitigating factors not applicable to Lawrence.  18 U.S.C. § 3592(a)(1)–(7).  The FDPA permits introduction of information "as to any matter relevant to the sentence."  18 U.S.C. § 3593(c).  In determining a sentence, the jury is permitted to consider the evidence presented during the guilt phase.  *See United States v. Catalan-Roman*, 585 F.3d 453, 468 (1st Cir. 2009); *United States v. Causey*, 185 F.3d 407, 411–12 (5th Cir. 1999).  In this case, the jury convicted Lawrence of two death-eligible offenses:  attempted armed bank robbery, with the additional findings that he put a person's life in jeopardy by use of a dangerous weapon and killed Hurst; and using or carrying a firearm during and in relation to an attempted armed bank robbery, with the additional findings that he brandished a firearm, discharged a firearm, and murdered Hurst.  At the eligibility stage, the jury found unanimously that Lawrence met the age factor (eighteen or older), the four intent factors, two statutory aggravating factors, and two non-statutory aggravating factors.

In the penalty selection phase, which took five full days, more than twenty witnesses testified on Lawrence's behalf, including numerous friends and relatives. In addition, testimony was given by a librarian, a GED instructor at a county jail, a hospital chaplain, a deputy marshal, a deputy sheriff, a high school football coach, a surgeon who treated Lawrence after he was wounded in the bank robbery, and psychologist Mark Cunningham.

The proofs showed that Lawrence was born in 1975 in Marysville, Ohio to a heroin-addicted mother who was serving time in prison. Lawrence's mother's sister took care of him for the first few months of his life. Twenty-two years old, she was also raising two of Lawrence's siblings and other children and was pregnant with yet another child. Lawrence's aunt testified that he cried incessantly and had trouble eating. Lawrence's great aunt and uncle, Eileen and Manuel "Peewee" Lopez, took Lawrence in because they believed his aunt was unfit to care for him. Eileen said that Lawrence was malnourished. She attributed his crying to withdrawal from heroin. The Lopezes were in their fifties and had several children of their own. Although Ed Lawrence was listed as Lawrence's father, his relatives believed that a man named Jerry Hall was actually his father. Hall died when Lawrence was six years old. Neither Lawrence's mother nor his father had more than minimal contact with him.

Manuel and Eileen Lopez had a stormy relationship that had been marked by physical abuse. Manuel was an alcoholic and sometimes took Lawrence with him to bars as he drank and picked up women. Manuel, the only father figure in Lawrence's early life, died in 1981. The Lopez family had attempted to prevent Lawrence from having contact with his mother's side of the family. However, cousins on his mother's side lived nearby in the same poor neighborhood, and he associated with them as he grew older. Lawrence's brother and several of his aunts, uncles, and cousins spent time in prison for drug trafficking and weapons offenses. Two relatives enlisted in military service and secured jobs. Lawrence also spent some time with his aunt and uncle Yolanda and Greg Tolliver. Greg Tolliver was a pastor and was portrayed as a positive influence in Lawrence's life. He died in 2003.

With financial support from the Lopez family, Lawrence attended private schools. Family members said he started dealing drugs at age eleven and recalled that older cousins forced him and other boys to fight each other. He played football in high school, but changed schools each year. Lawrence did not graduate. He had a few jobs, but did not work long at any of them. One of his cousins noticed that Lawrence began driving expensive cars and wearing jewelry, but did not ask where Lawrence got his money.

Friends and relatives testified that they cared for Lawrence, that he was a good person, and that they would be deeply affected if he were sentenced to death. They also stated that if Lawrence were sentenced to life imprisonment, he could help others, including his children, by encouraging them to avoid a life of crime. Several mentioned his attachment to his daughter Kennedy, one of five or six children Lawrence fathered. Lawrence's friends and relatives also said they would continue to support him while in prison. They believed he had accepted responsibility for what he had done and had turned to God. On cross-examination, they admitted that Lawrence was $15,000 behind in child support, did not pay rent or bills when he lived with a girlfriend for six months, crashed the girlfriend's car while driving it without a license and without her permission, and never repaid money he borrowed from Eileen Lopez.

Law enforcement officials testified that Lawrence was well-behaved and respectful, although he did file some complaints while in a county jail. A librarian testified that Lawrence took GED courses. The doctor who treated Lawrence's gunshot wounds after the January 2005 attempted bank robbery described his injuries and the long-term effects. Lawrence lost a finger on his left hand and suffered partial paralysis in the left arm.

Clinical psychologist Dr. Mark Cunningham testified at length about factors that contribute to criminal behavior and about their presence in Lawrence's background. He had reviewed Lawrence's school, medical, criminal, and employment records, and had interviewed Lawrence, his fiancée, his relatives, and jail employees. Dr. Cunningham also referred to studies by the Department of Justice.

Dr. Cunningham identified several damaging developmental factors in Lawrence's life. He noted that reports that Lawrence was exposed to alcohol and drugs in the womb were consistent with accounts that he was colicky and experienced digestive problems and sleep disturbances as an infant. Children exposed to alcohol in the womb, he testified, tend to be hyperactive and have executive function problems, such as deficits in impulse control, judgment, responsibility and empathy, as well as difficulties with delayed gratification. According to the family members Dr. Cunningham interviewed, Lawrence had sustained a number of head injuries. Some of these had rendered him unconscious for short periods of time. Dr. Cunningham stated that Lawrence probably had attention deficit/hyperactivity disorder as a child, although there was no record that he had been so diagnosed. Lawrence began to abuse alcohol and drugs as a teen, had failing grades, and was suspended and expelled from school. Dr. Cunningham noted that there are genetic predispositions for alcohol and drug dependence and for psychological and personality disorders. He testified that several of Lawrence's relatives had histories indicating that Lawrence may have inherited certain predispositions.

In the Lopez home, Lawrence's care rotated among Manuel and Eileen and their adult children. He had no single, stable caretaker. Manuel and Eileen also worked as house parents for a group of mentally handicapped people. Thus, when he stayed with them, Lawrence was exposed to a chaotic environment. Dr. Cunningham said that Lawrence felt abandoned and that children in his situation tend to blame themselves. Dr. Cunningham explained that a lack of parental structure and discipline in childhood is commonly associated with aggressive and violent behavior later in life. Neglect is more damaging than abuse, and abused and neglected children are much more likely to be arrested as juveniles and adults.

Lawrence was also exposed to sex at an early age. His uncle Donald watched the Playboy Channel in Lawrence's presence. Donald and Manuel engaged in adulterous affairs. Lawrence knew only one faithful man, Greg Tolliver. Lawrence began having sex when he was eleven or twelve years old and at age thirteen or fourteen regularly had

sex with a nineteen-year-old woman. Dr. Cunningham testified that early engagement in sexual activity is injurious in many different ways.

Dr. Cunningham also pointed to community factors. He described the residential community where Lawrence grew up, a low-income area of Columbus with a high number of single-parent households, as "toxic." He said that Lawrence knew no intact families and knew only five adult men with jobs. There was criminal activity and violence in the housing projects where Lawrence lived. Twenty-five of his peers had been in prison, for crimes including drug offenses, murder, extortion, and weapons violations. Violence and victimization were rampant in the community. Dr. Cunningham testified that living in such an environment hinders healthy moral development, especially for a person such as Lawrence, who had been exposed to alcohol and drugs in the womb, may have been handicapped by certain genetic predispositions, experienced parental abandonment, and grew up in a chaotic household.

Dr. Cunningham also addressed Lawrence's potential adjustment to prison. He testified that Lawrence could make a positive adjustment to prison life, considering his age (thirty-one), his past behavior in jail (one non-violent infraction), and his relationship with his family. Dr. Cunningham said that older prisoners and those with long prison terms tend to adjust better than younger ones with short terms. He noted that Lawrence was close to completing a GED, and that higher levels of education are correlated with less violent behavior. Dr. Cunningham referred to evidence tending to show that prisoners serving life without parole are less likely to commit assaults and that those convicted of murder are less likely than other prisoners to be violent in prison. Dr. Cunningham also described the type of prison where Lawrence would likely be incarcerated if sentenced to life imprisonment and explained the security levels, privileges, and security measures used.

On cross-examination, Dr. Cunningham said that he had testified in more than a hundred capital cases, always for the defendant. He acknowledged that there were hospital records for only one of the head injuries Lawrence had sustained. Dr. Cunningham said that Lawrence was never charged with drug dealing as a juvenile and

did not have a criminal record until age twenty-five. There were no reports of child abuse or neglect investigations by child protective services agencies. Dr. Cunningham did not conduct any assessment of Lawrence's psychological functioning or arrive at any diagnosis, and he was not aware of any other such assessment having been done. He acknowledged there was no evidence that Lawrence was mentally retarded. The prosecutor asked Dr. Cunningham about a letter Lawrence wrote to a judge after he was convicted of receiving stolen property. In the letter, Lawrence said he had become a Christian, apologized, and mentioned his fiancée and baby. Dr. Cunningham acknowledged that the letter was self-serving. He stated that he did not diagnose any of Lawrence's family members and had based his descriptions of them on the interviews he conducted. Finally, he said he was unaware of any other family member having committed armed robbery or homicide.

The prosecution presented eight witnesses: Hurst's mother, stepfather, sister, brother, wife, cousin's husband, and mother-in-law, and a police officer who worked with Hurst. Hurst's relatives displayed family photos and read statements about Hurst and the effect of his death. They recounted his childhood, his career in the military, his decision to join the Columbus Police Department, and his role as a husband and father. Hurst married in 2003 and his wife gave birth to a daughter in 2004. Several of the witnesses called him a hero. Several also described the pain, grief, and fear they experienced as a result of Hurst's death. Hurst's wife spoke of the difficulty of being a young widow raising a baby on her own.

Upon review of the entire record, we find no evidence that the jury's decision to sentence Lawrence to death on Count Eight was the result of passion, prejudice, or any other arbitrary factor. Before the sentencing hearing, the district court instructed the jurors that, in determining whether the aggravating factors sufficiently outweighed the mitigating factors, they could consider any evidence that was presented during the guilt, eligibility, and sentencing phases of trial. The jury unanimously found beyond a reasonable doubt that Lawrence possessed the requisite mental states, including that he killed Hurst intentionally and that he murdered Hurst. To conclude that Lawrence

murdered Hurst, the jury had to find that Lawrence had malice aforethought, meaning that he acted deliberately and intentionally or with callous and wanton disregard for human life.

The jury found two statutory aggravating factors established: that Lawrence knowingly created a grave risk of death to one or more persons in addition to Hurst; and that Lawrence killed Hurst in expectation of pecuniary gain. The jury found two non-statutory aggravating factors established: that Lawrence committed three other bank robberies armed with a firearm, wearing a mask, and making threats to victims within a year of the commission of the capital crimes; and that Lawrence caused harm to Hurst's family members, friends, and community members by committing his capital crimes. As indicated above, there was sufficient evidence to warrant the jury's finding that Lawrence killed Hurst for pecuniary gain. *See* 18 U.S.C. § 3592(c)(8). The evidence was also sufficient to support the finding that Lawrence created a grave risk of death to people other than Hurst. *See* 18 U.S.C. § 3592(c)(5). The evidence showed that Lawrence fired seven shots at Hurst, initiating an exchange of gunfire in a bank lobby occupied by several employees and customers. S*ee Allen*, 247 F.3d at 787 (finding sufficient evidence to support grave-risk-of-death aggravating factor, where there was testimony that defendant discharged a rifle five times inside a bank during a robbery with numerous bank employees and customers present). The victim-impact evidence was powerful, especially that of Hurst's wife as she described her life without her husband and the difficulties of raising their infant daughter alone.

On the other side of the equation, one or more jurors found forty-seven out of forty-nine proposed mitigating factors established in relation to Count Eight, and jurors added two of their own: "The death of Greg Tolliver in December of 2003" and "Daryl Lawrence was forced to participate in family fights by his older cousins." The mitigating factors found to be established by at least six jurors included: Lawrence's upbringing, that he grew up in extreme poverty, that he was exposed to drugs and violence as a child, that he was abandoned by both biological parents and never knew his father, that his biological mother died in 2003, that his father was known as a robber

and thief, that his mother was a convicted felon, that Lawrence was a product of family dysfunction and criminality, that he grew up without strong parental guidance, that Lawrence's criminality was caused in part by his upbringing, that he was exposed to alcohol and drugs as a fetus, that Lawrence had remorse for killing Hurst, that he accepted responsibility for his actions, the contents of Lawrence's handwritten journal, that Lawrence had the ability to conform to incarceration and would likely make a positive adjustment to prison, his potential for rehabilitation, his capacity to be loving and kind, that Lawrence is a father, his age and education, that he would be able to maintain positive relationships with family members if sentenced to life, that Lawrence does not want to die, that his family members want him to live, that his execution would cause his family great emotional pain and distress, the role of mercy, that Lawrence's children would grow up without a father if he were executed, that life imprisonment is an appropriate and sufficient punishment, that he would never be released from prison, that the death sentence is a penalty of last resort, that Greg Tolliver died in 2003, and that Lawrence was forced to participate in family fights. In short, many jurors agreed with many of the mitigation themes presented and argued by Lawrence's counsel. The jury did not overlook or ignore the mitigation evidence. The jurors clearly gave serious consideration to both the evidence and their responsibility to weigh it. Ultimately, they unanimously found that the mitigation evidence was outweighed by the aggravating factors.

It is significant that the FDPA requires a higher standard of proof for aggravating factors than for mitigating ones. Although all jurors were permitted to consider a mitigating factor found by any one of them, the jurors were not required to find any particular evidence mitigating or to give it any particular weight. *Basham*, 561 F.3d at 337; *Higgs*, 353 F.3d at 327; *Paul*, 217 F.3d at 999. Moreover, the jury has complete discretion in its determination of whether the aggravating factors outweigh the mitigating factors. *Sampson*, 486 F.3d at 31; *Allen*, 247 F.3d at 781. The weighing process is not numeric. It is the significance, not the number, of aggravating and mitigating factors that determines the sentence selection decision. *See Davis*, 609 F.3d at 673. There was ample evidence of the crimes Lawrence committed and the

aggravating factors found by the jury. The jury also recognized that Lawrence's background was troubled. There is no indication, however, that the jury arbitrarily overstated the significance of the aggravating factors or understated the importance of the mitigating factors. In light of the substantial evidence supporting the aggravating factors found by the jury, we cannot say that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. *See Agofsky*, 458 F.3d at 373–74 (holding that speculation is insufficient to show arbitrary influence). Comparison of the weighing processes and verdicts evaluated and upheld in other federal death penalty cases confirms our conclusion that the jury's Count Eight verdict in this case was supported by sufficient evidence. *See Lighty*, 616 F.3d at 343–47; *Paul*, 217 F.3d at 995, 1004–05.

Further, for the reasons stated in our earlier opinion, *Lawrence*, 555 F.3d at 263–68, we continue to reject Lawrence's argument that the jury's verdict of life imprisonment on Count Seven—although for a similar offense and based on consideration of similar aggravating and mitigating factors—indicates that its decision for the death penalty on Count Eight was arbitrary and irrational. The two verdicts are different, but this difference does not evidence irrationality "where the 'bottom line' jury verdicts are unanimous and not inconsistent." *Id.* at 268. As we explained:

> They are different, but quite reasonably so, considering that jurors' mitigation findings differed and the degree of criminal culpability involved in the two offenses differed. In other words, the difference between the jury's bottom line verdicts does not bespeak logical inconsistency or irrationality, but rather, quite the opposite. To the extent the differences in the jurors' mitigation findings remain unexplained and and may give rise to speculation, the fact remains that there is no evidence that any arbitrary factor "most likely" influenced the bottom line verdicts. *See Agofsky*, 458 F.3d at 373 (holding that death sentence is not to be vacated absent showing that arbitrary factor "most likely" influenced the sentence).

*Id.* Lawrence has failed to identify grounds for belief that any arbitrary factor most likely influenced the jury's Count Eight sentencing verdict. We therefore reject Lawrence's sufficiency-of-the-evidence challenge.

**14. Double Jeopardy Violation**

Lawrence argues that he was prosecuted and sentenced twice for the same offenses because the bank robberies that formed the bases for his convictions under Counts One through Six were also used as a non-statutory aggravating factor when he was sentenced under Counts Seven and Eight. Because Lawrence did not raise this issue in the district court, we review only for plain error.

The Double Jeopardy Clause of the Fifth Amendment protects against a second prosecution for the same offense after acquittal or conviction and against multiple punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229 (1994). The sentencing phase of a capital case is not a successive prosecution for double jeopardy purposes. *Id.* at 230; *Williams v. Oklahoma*, 358 U.S. 576, 586 (1959) (holding that considering murder as an aggravating circumstance justifying the death sentence for a kidnaping conviction is not double jeopardy). "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment." *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)). A capital sentencer's finding, or failing to find, an aggravating circumstance does not "convict" or "acquit" a defendant. *Id.* *See Romano v. Gibson*, 239 F.3d 1156, 1178 (10th Cir. 2001). Further, use of prior convictions to enhance a sentence for a subsequent offense does not constitute double jeopardy. *Schiro*, 510 U.S. at 230; *see also Witte v. United States*, 515 U.S. 389, 399 (1995) (holding that use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause).

Lawrence was not punished twice for any of the bank robberies; rather, the fact that he had committed prior bank robberies was used as an aggravating factor to be considered by the jury in selecting the appropriate sentences for homicide under Counts Seven and Eight. The jury convicted Lawrence of bank robbery and firearms offenses under Counts One through Six stemming from bank robberies committed during January,

August, and September 2004. The jury was asked to consider whether "the fact that Daryl Lawrence, within a year of the commission of the capital crimes, committed three other bank robberies armed with a firearm, wearing a mask, and making threats to victims" was an aggravating factor beyond a reasonable doubt. The use of these convictions as an aggravating circumstance for Counts Seven and Eight was not a successive prosecution, and the jury did not "convict" Lawrence of anything when it found that the prior bank robberies were an aggravating factor. Accordingly, Lawrence was neither prosecuted nor punished twice for the same offenses. The jury's use of the prior bank robbery convictions as an aggravating factor did not violate Lawrence's rights under the Double Jeopardy Clause.

### 15. Reasonable-Doubt Instruction Regarding Weighing Process

Lawrence contends the district court erred when it refused to instruct the jurors that, in order to impose a sentence of death, they had to unanimously agree that the government had proven *beyond a reasonable doubt* that the aggravating factors sufficiently outweighed the mitigating factors. He contends that such a reasonable-doubt instruction is required under the Fifth and Sixth Amendments and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because a determination that the aggravating factors outweigh the mitigating factors is a finding of fact that increases the maximum possible sentence that may be imposed.

We review de novo a claim that a jury instruction improperly or inaccurately stated the law. *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011). However, the district court's refusal to give a requested instruction is reviewed for abuse of discretion. *Id.*

Under the FDPA, to justify a sentence of death, the jury must by unanimous vote determine that the aggravating factors "sufficiently outweigh" the mitigating factors or, absent mitigating factors, that the aggravating factors alone justify the sentence. 18 U.S.C. § 3593(e). Beyond this, the FDPA does not specify the standard of proof. The relevant jury instructions given by the district court were entirely consistent with the

language of § 3593(e).  R. 291, Trial Tr. vol. 17 at 97–99, Page ID # 6233–35.  In addition, the court added:

> Whether the evidence favoring the death sentence is sufficient to warrant actually sentencing Daryl Lawrence to death is a question that the law leaves up to you.
>
> [W]hat is called for in weighing the various factors is not arithmetic, but your careful, your considered, and your mature judgment.
>
> You must be guided by justice.  When I speak of justice, I speak of the highest ideal of the law and the standard by which societies are measured.  Justice contemplates the careful application of human reason and experience to a set of circumstances.  It contemplates an even-handed weighing of those circumstances in an effort to reach a fair result.

*Id*. at 98–99, Page ID # 6234–35.  The court, however, refused to instruct the jury that any determination that the aggravating factors sufficiently outweighed the mitigating factors to justify the death sentence had to be made beyond a reasonable doubt.

The district court's refusal was neither legal error nor an abuse of discretion.  In *United States v. Gabrion*,  719 F.3d 511, 532–33 (6th Cir. 2013) (en banc), we recently rejected the very argument Lawrence makes here.  We concluded that the weighing process prescribed by the FDPA, 18 U.S.C. § 3593(e), requires "not a finding of fact, but a moral judgment."  *Id.* at 533.  The weighing process, we held, called on the jury to decide whether a sentence of death was "just," a moral judgment on which "the jury did not need to be instructed as if it were making a finding of fact."  *Id.*  In holding that the very argument Lawrence now makes is meritless, we joined the six other circuits that have addressed the question.  *See United States v. Runyon*, 707 F.3d 475,  516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008); *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).

The *Gabrion* ruling is dispositive and controlling. Lawrence's claim of error challenging the district court's refusal to give a reasonable-doubt instruction in connection with the weighing process is denied.

### 16. Failure to Give "Solitary Juror" Instruction

Lawrence contends the district court erred by denying his request to instruct the jury that a solitary juror may prevent the death sentence, thereby violating his Fifth and Eighth Amendment rights. Again we review de novo a claim that a jury instruction improperly or inaccurately stated the law. *Roth*, 628 F.3d at 833. However, the district court's refusal to give a requested instruction is reviewed for abuse of discretion. *Id.* We will reverse a judgment on the basis of an erroneous instruction only if the instruction, viewed as a whole, was confusing, misleading, or prejudicial. *United States v. Garcia-Meza*, 403 F.3d 364, 372 (6th Cir. 2005).

Lawrence cites *Mills v. Maryland*, 486 U.S. 367 (1988), and *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), arguing that jury instructions in a capital case are unconstitutional if they prevent jurors from giving due consideration to factors that may call for a less severe penalty or lead a juror to believe that his or her vote could not affect the ultimate result. He contends this teaching was applied in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), to require a "solitary juror" instruction under Ohio's death penalty statute. Lawrence argues that the district court's refusal to give such an instruction in this case may have led jurors to believe that a life sentence could be imposed only if all jurors rejected the death penalty.

On review of the instructions, we find no grounds for the notion that a juror could have reasonably understood them to convey the meaning suggested by Lawrence. In *Mills*, the Supreme Court held jury instructions constitutionally infirm because there was a substantial probability that the jurors may have erroneously thought they were precluded from considering any mitigating evidence unless all twelve jurors agreed on its existence. *Mills*, 486 U.S. at 384. In *Kubat*, the Seventh Circuit, following *Mills*, found instructional error where it was conceded that the instructions misstated Illinois law by improperly suggesting that a sentence of imprisonment could be imposed only

if all jurors agreed that the defendant should not be sentenced to death. *Kubat*, 867 F.2d at 372–73. The *Kubat* court implied that the instructions would have passed constitutional muster if they had clearly stated that the death sentence would not be imposed if even one juror believed it inappropriate. In *Brooks*, the Ohio Supreme Court applied *Mills* and *Kubat,* vacating the sentence where the jury was instructed, contrary to Ohio law: "You are now required to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." *Brooks*, 661 N.E.2d at 1040. Finding it clear under Ohio law that a solitary juror may prevent a death penalty recommendation, the *Brooks* court held that "[j]urors from this point forward should be so instructed." *Id.* at 1042.

None of the instructional errors presented in these cases is evident in the present case. Here, the district court clearly and repeatedly instructed the jury, consistent with 18 U.S.C. § 3593(e), that, in order for them to decide which was the appropriate sentence, their verdict, whether for death or life, had to be unanimous. R. 291, Trial tr. vol. 17 at 84, 97, 99, Page ID # 6220, 6233, 6235. The district court also instructed the jurors that "[e]ach juror must decide individually whether Daryl Lawrence should be sentenced to death or to life in prison without any possibility of release." *Id.* at 99, Page ID # 6235. The sentencing verdict forms for Counts Seven and Eight recited "All must agree" and provided twelve signature lines for the jurors.

The district court declined to give the requested instruction as to the effect of a single juror's disagreement, but no conclusion could reasonably be drawn from the instructions other than that the jury could not return a decision for death, or for life imprisonment without possibility of release, absent unanimity. By necessary implication, a single juror's disagreement would defeat a unanimous decision for either death or life imprisonment. The court declined to expressly advise the jury that, absent a unanimous jury decision for one sentence or the other, the court would have the authority to impose a sentence of imprisonment for life. *See* 18 U.S.C. § 3594. However, in language substantially equivalent, the court advised the jury "that if you do

not sentence Daryl Lawrence to death, he will spend the rest of his life in prison without any possibility of release." *Id.* at 100, Page ID # 6236.

Lawrence argues that his requested instruction was a correct statement of the law. But not every instruction that could be given must be given. Considering the instructions as a whole, we find that the concept Lawrence wanted conveyed was adequately communicated in other instructions. There is no substantial probability that a reasonable juror could have been led to believe that a sentence of death could be imposed absent his or her agreement. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010) (rejecting a habeas petitioner's claim that counsel was ineffective for having failed to request a "solitary juror" instruction because the unanimity instructions "unmistakably informed the jury that the death penalty must be endorsed by every juror, and thus that one juror could prevent it.").

Further, though the requested instruction is a correct statement of the law, its true effect is to advise the jury of the consequences of its failure to reach unanimity, a type of instruction the Constitution does not require. *See Louis Jones v. United States*, 527 U.S. 373, 381–84 (1999). In *Jones*, the Court took notice of the "strong governmental interest" in obtaining a unanimous sentencing decision. The Court recognized that initially instructing the jurors on the consequences of their potential failure to agree, i.e., that the court would impose a life sentence, would tend to undermine that interest by inviting the jurors to avoid their responsibility by disagreeing. *Id. See also Williams v. Anderson*, 460 F.3d 789, 809–10 (6th Cir. 2006); *Coe v. Bell*, 161 F.3d 320, 339–40 (6th Cir. 1998).

Lawrence insists that the instructions actually given might have led jurors to believe that a life sentence was possible only if *all* jurors rejected the death sentence. We flatly reject this argument. The instructions simply cannot reasonably be so construed. But even if a juror could conceivably have misunderstood the instructions in this way, such a possible misunderstanding would not render proper instructions unconstitutional. So-called "acquittal first" instructions have not been held

unconstitutional or otherwise contrary to federal law.  *See Bobby v. Mitts*, 131 S. Ct. 1762, 1765 (2011); *Smith v. Spisak*, 558 U.S. 139, 148 (2010).

Accordingly, the district court did not err when it refused to give the requested "solitary juror" instruction.

**17.  Adequacy of "Malice Aforethought" Instruction**

In relation to the Count Eight murder charge, Lawrence argues that the district court erred in its definition of "malice aforethought" in the guilt phase instructions. Lawrence did not object to the jury instructions at trial and in fact proposed the very same language the district court used.  It follows that Lawrence has essentially waived his right to appellate review under the "invited error" doctrine. *See Fulcher v. Motley*, 444 F.3d 791, 798–99 (6th Cir. 2006) (recognizing that an appellant may not later claim error in instructions he had submitted); *United States v. Barrow*, 118 F.3d 482, 490 (6th Cir. 1997) (same).  Lawrence's waiver does not absolutely foreclose review if the interests of justice demand relief, but he must meet the requirements of plain-error review. *United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005).  Lawrence must show that any flaw in the instruction was plain error that so seriously affected his substantial rights as to impugn the integrity and outcome of the proceedings. *Puckett*, 556 U.S. at 135.

Section 924(j), under which Lawrence was convicted in Count Eight, incorporates the definition of murder contained in 18 U.S.C. § 1111. *Ostrander*, 411 F.3d at 688.  Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought."  The district court instructed the jury that malice aforethought means "either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life."  Citing *United States v. Branch*, 91 F.3d 699, 734 (5th Cir. 1996), Lawrence now asserts on appeal that the jury should have been instructed that "if intent to kill is not established, the government must prove 'an intent willfully to act in callous and wanton disregard of the consequences to human life.'"  He argues that, by omitting the words "an intent willfully" from the latter half of the

definition, the district court's instruction diminished the *mens rea* element that the government was required to prove.

A challenge to the *mens rea* element of a similar malice-aforethought definition was addressed in *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995). We held that an instruction defining malice aforethought as including either intentional wrongdoing or recklessness with extreme disregard for human life adequately spelled out the requisite *mens rea* element. *Id.* In *Garcia-Meza*, 403 F.3d at 371–72, moreover, we upheld a definition of malice aforethought that was materially identical to the present definition. The instruction given in this case is entirely consistent with governing Sixth Circuit authorities. That other courts have used a slightly different formulation does not mean the definition used in this case was deficient. Lawrence falls far short of persuading us that the definition of malice aforethought given to the jury was confusing, misleading or prejudicial. He has failed to show error, much less plain error.

### 18.  Prosecutorial Misconduct during Closing Argument

Lawrence argues that the government committed misconduct during closing argument at sentencing in four distinct ways: (a) by asking the jury to impose the death sentence to protect community values and deter criminal conduct by others, rather than by individualized balancing of Lawrence's aggravating and mitigating factors; (b) by arguing that Lawrence's exercise of his right to trial demonstrated that he did not accept responsibility for his actions; (c) by asking the jury to comparatively weigh the value of Hurst's life and Lawrence's life; and (d) by unfairly denigrating Lawrence's expert mitigation witness, Dr. Cunningham.

Generally, the prosecuting attorney is given "wide latitude" during closing argument and any challenged remarks are evaluated in the context of the trial as a whole. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). "The prosecution is not required to present closing arguments that are 'devoid of all passion.'" *Id.* at 670 (quoting *Byrd v. Collins*, 209 F.3d 486, 532 (6th Cir. 2000)). We employ a two-step process in reviewing claims of prosecutorial misconduct. First, we determine whether the prosecutor's comments were improper. Second, if the comments were improper, we

consider whether they were so flagrant as to warrant reversal. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). To warrant reversal, prosecutorial misconduct must have rendered the trial fundamentally unfair. *United States v. Warshak*, 631 F.3d 266, 305 (6th Cir. 2010). Four factors guide our determination of flagrancy: "'(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.'" *Carson*, 560 F.3d at 574 (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). *See also United States v. Ham*, 628 F.3d 801, 810 (6th Cir. 2011). Ordinarily, a claim of prosecutorial misconduct is reviewed de novo, but where the defendant failed to object during trial, the claim is reviewed for plain error. *Carson*, 560 F.3d at 574.

**(a)** *"Send a Message" Remarks*

Lawrence's argument that the prosecutor improperly asked the jury to send a message to the community is based primarily on the following remark:

> [I]f you make it loud and clear that the community will not tolerate this conduct, the community will not tolerate a man dying because of money, will not tolerate people entering banks with firearms and killing people trying to protect us, if you make that crystal clear, it may save the next Bryan Hurst.

R. 291, Trial tr. vol. 17 at 69, Page ID # 6205. Lawrence objected, arguing that the "send a message to the community" argument was improper. The district court overruled the objection. On appeal, Lawrence not only challenges this remark, but also contends that the prosecution overstepped its bounds: (1) by arguing that Hurst's murder affected the police family "beyond the borders of the State;" (2) by asking the jury to tell Hurst's wife, through their verdict, that "they did do the right things in life;" and (3) by asking the jury to tell police officers and the community "what weight you give to their loss, to their plight, to their ability to fight fear and to do their job." *Id.* at 33, 67, 69, Page ID # 6169, 6203, 6205. Lawrence objected to the first of these remarks but not the second or third.

In *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991), the court recognized that  because a jury will normally place great confidence in the faithful execution of the obligations of the prosecuting attorney, the prosecutor must observe a high standard of conduct to ensure that the defendant's right to a fair trial is not prejudiced.  The prosecutor must avoid "undignified and intemperate" arguments and arguments that may contain "improper insinuations and assertions calculated to mislead the jury" by inciting passion and prejudice.  *Id.*  However, "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible."  *Id.* at 1151.  Nor is it improper for the prosecutor to make an "allusion to the general need to convict guilty people."  *Id.* at 1154.

In *Solivan*, the prosecutor was deemed to have gone too far by appealing to the jury's "fear surrounding the War on Drugs" in a calculated attempt to "arouse passion and prejudice and to inflame jurors' emotions regarding the War on Drugs by urging them to send a message and strike a blow to the drug problem." *Id.* at 1153.  Explaining why such arguments prejudiced the defendant's right to a fair trial, the court observed:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future law breaking.  The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.  Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem.  The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*Id.* (quoting *United States v. Monaghan*, 741 F.2d 1434, 1141 (D.C. Cir. 1984)).  In contrast, *Solivan* was distinguished in *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004), where remarks such as "it is time you sent a message to the community" and "the people in the community have the right to expect that you will do your duty," were deemed permissible.  *Id.* at 219.  Such statements were deemed legitimate references to "the general community need to convict guilty people" that did not mislead or inflame the jury by appealing to a need to solve a wider social problem.  *Id.*

In light of these standards, some of the prosecutor's comments may have skirted the line of impropriety. *Solivan* may be distinguished where a prosecutor is seeking a particular punishment rather than seeking a conviction. But by invoking the need to protect community values and deter criminal conduct by others and by asking the jury to communicate messages to Hurst's family, the police community and the community in general, the prosecutor invited the jurors to consider arguably irrelevant factors. Still, the prosecutor did not expressly link the jury's verdict in Lawrence's case to other bank robbers and murderers or to the need to address any particular social problem. The prosecutor's references to community values were brief and general and represent a permissible request for the jury to act as the community conscience. The remarks do not appear to have been calculated to mislead or inflame the passions of the jurors. They were devoid of improper insinuations and were not intemperate or undignified. Further, insofar as impact-on-the-community evidence was properly admitted to establish a non-statutory aggravating factor, on which the court instructed the jury, the prosecutor was entitled to comment on the evidence in closing argument.

Moreover, the complained of comments were not flagrant or extensive and did not result in prejudice to Lawrence's rights. The district court instructed the jury that arguments by counsel were not evidence, and explained that the jurors were to weigh the aggravating factors proven by the prosecution against any mitigating factors established by the defense to determine the appropriate sentence. Although Lawrence presented extensive mitigation evidence and the jurors found that he had established several mitigating factors, the evidence of aggravating factors was strong. On balance, the prosecutor's remarks did not amount to flagrant misconduct and did not render Lawrence's sentencing fundamentally unfair.

### (b) *Exercise of Right to Trial*

Lawrence next contends the prosecutor engaged in misconduct by challenging Lawrence's assertion, as a mitigating factor, that he had accepted responsibility for his actions. The prosecuting attorney pointed out that Lawrence had contested the charges at trial and had "denied all the elements of the offenses."

The prosecution's use of a defendant's exercise of his constitutional rights against him may amount to prosecutorial misconduct. *See*, *e.g.*, *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding that neither the prosecutor nor the trial court can comment on or instruct the jury that defendant's invocation of his Fifth Amendment right to remain silent at trial is evidence of guilt). On the other hand, a prosecutor can make a fair response to a claim made by the defendant or his counsel. *See United States v. Robinson*, 485 U.S. 25, 32 (1988) (holding that where trial counsel alleged the government had denied the defendant the opportunity to explain his actions and the defendant did not testify, it was permissible for the prosecutor to comment that defendant could have taken the stand).

Here, the claim is not that the prosecutor commented on Lawrence's failure to take the stand but on his decision to go to trial. The specific remarks challenged are as follows:

> [Lawrence] claims that he has accepted responsibility for his actions. Yet, I thought we had a trial. He denied all of the elements of the offenses – [objection, overruled]. It was even claimed – even claimed during the course of the trial that Officer Hurst shot first and the defendant returned fire. And he has accepted responsibility?

R. 291 Trial tr. vol. 17 at 23, Page ID # 6159. Although Lawrence did not testify, several witnesses said that he had accepted responsibility. Similar sentiments were also expressed in a journal entry written by Lawrence that was entered into evidence. The prosecutor's remarks thus represented a comment on the evidence, tending to question or impeach the evidence by referring to Lawrence's actions in response to prosecution. Contrary to Lawrence's argument, the prosecutor did not tell or ask the jury to ignore or disregard the evidence. *See Bolden*, 545 F.3d at 630 (observing that the prosecutor may argue that asserted mitigating factors are entitled to little or no weight, as long as jurors are not told to ignore or disregard mitigators). The fact that Lawrence had gone to trial on the charges against him was a fact the jurors were invited to consider in weighing the evidence that he had accepted responsibility.

A defendant's denial of guilt and putting the government to the burden of proving guilt is ordinarily relevant in evaluating the defendant's entitlement to mitigating credit for acceptance of responsibility. Its probative value is clearly diminished, however, where, as here, the defendant sought but was denied a plea agreement that would have precluded the death penalty. R. 279, Trial tr. vol. 5 at 195–96, Page ID # 4089–90. The suggestion that Lawrence's exercise of his right to trial, in order to avoid death, refutes evidence that he accepted responsibility for his actions carries little weight. In this respect, the remark may be viewed as having a slight tendency to mislead the jurors. But even if the prosecutor's comments were deemed improper, they were not flagrant. *See Ham*, 628 F.3d at 810. Lawrence's exercise of his right to trial, a fact well known to the jury, was mentioned only once by the prosecutor, an isolated remark. The point was not unduly emphasized. The district court instructed the jury that it was to make its decision based only on the evidence presented in court and that the attorneys' arguments were not evidence. Viewing the remark in the context of the trial as a whole, the likelihood that the jurors were prejudicially misled is minimal. This is corroborated by the fact that eight jurors found that Lawrence had proved acceptance of responsibility as a mitigating factor for Count Eight.

In sum, the prosecutor's comments on Lawrence's exercise of his right to trial did not amount to flagrant misconduct and did not render Lawrence's sentencing fundamentally unfair.

### (c) *"Comparative Worth" Remark*

At the end of his initial closing argument, after reviewing and discounting Lawrence's mitigating evidence and after summarizing the aggravating factors, the prosecutor invited the jury to consider the victim-impact evidence and weigh it against the "wasted life of Daryl Lawrence." The "wasted life" comment was the prosecutor's characterization of the product of Lawrence's poor choices. Lawrence contends this contrasting of Hurst's promising, vibrant, and valuable life with Lawrence's "wasted life" was improper, citing *Payne v. Tennessee,* 501 U.S. 808 (1991).

In *Payne*, the Court observed that victim-impact evidence may be offered to show each victim's "uniqueness as an individual human being"; it is not offered to encourage comparative judgments of victims as though to suggest that the killer of a hardworking, devoted parent should be punished more severely than the killer of a reprobate. *Payne*, 501 U.S. at 823. The *Payne* Court recognized that "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* at 825. The Court recognized the government's legitimate interest in "counteracting" the defendant's mitigating evidence by reminding the sentencer that the victim, like the murderer, is an individual whose death represents a unique loss to family and society. *Id.*

The argument said to be improper is thus entirely consonant with the teaching of *Payne*. The prosecutor's urging the jury to "weigh" the victim-impact evidence against Lawrence's mitigating evidence is entirely consistent with *Payne*'s recognition that victim-impact evidence is properly considered to "counteract" the mitigating evidence in helping the jury evaluate moral culpability. *See United States v. Fields*, 483 F.3d 313, 340–41 (5th Cir. 2007) ("[T]o the extent that the Court [in *Payne*] expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons."); *Humphries v. Ozmint*, 397 F.3d 206, 224 n.8 (4th Cir. 2005) (same). The prosecutor's argument is also consistent, of course, with the instruction requiring the jury to weigh the aggravating and mitigating factors.

Granted, the prosecutor's characterization of Lawrence's life as "wasted" was indelicate, but it was not so inappropriate as to render the remark improper or flagrant. There is no likelihood the remark misled the jury or so prejudiced Lawrence as to render the sentencing fundamentally unfair.

**(d)** *Denigrating of Expert Testimony*

Finally, Lawrence contends the prosecutor committed misconduct during closing argument by unfairly denigrating Lawrence's expert witness, Dr. Mark Cunningham. Lawrence complains that the prosecutor distorted Dr. Cunningham's testimony by characterizing it as suggesting that Lawrence was not morally responsible for his crimes. He also contends the prosecutor unduly emphasized Dr. Cunningham's fee of $20,000 and his history of having testified in 110 capital cases, always for the defense. Lawrence's trial counsel did not object.

The prosecutor should not express his opinion as to a witness's credibility, but he may highlight inconsistencies or inadequacies in the defense, and may forcefully assert reasonable inferences from the evidence. *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). Here, the prosecutor's comments about Dr. Cunningham were not improper or flagrant, and thus could not be plain error. The prosecutor did not ridicule or express his personal opinion about Dr. Cunningham's testimony. The prosecutor's remark that Dr. Cunningham claimed Lawrence was not morally responsible for his crimes, while inaccurate, was in response to an argument by defense counsel drawing a distinction between legal and moral culpability. Moreover, Lawrence's counsel responded to the prosecutor's mischaracterization in her closing argument, insisting that Lawrence was not trying to minimize or excuse his actions. The prosecutor's reference to Dr. Cunningham as a "professional witness" was fair comment on the evidence before the jury.

Under the FDPA, the government and the defendant are permitted to rebut information received at the sentencing hearing and present arguments as to any aggravating or mitigating factor. 18 U.S.C. § 3593(c); *United States v. Montgomery*, 635 F.3d 1074, 1097 (8th Cir. 2011). The prosecutor's comments on Dr. Cunningham's testimony were fair comment and did not deprive Lawrence of a fair sentencing hearing. *Cf. Slagle v. Bagley*, 457 F.3d 501, 523 (6th Cir. 2006) (holding that prosecutor's characterization of petitioner's expert witness testimony as "liberal quack theories" was improper, but not so flagrant as to deprive petitioner of fair sentencing hearing).

In sum, taken individually or cumulatively, the comments complained of did not deprive Lawrence of a fair sentencing hearing.

### 19.  Denial of Suppression Motion

Lawrence contends the district court erred when it denied his motion to suppress statements he made to the police during interrogation after he was arrested.  Lawrence contends that he was in pain, having sustained a gunshot wound to the left arm and hand three days earlier during the attempted bank robbery, and that the police denied him medical treatment until the interrogation was completed.  Though he was advised of his *Miranda* rights, Lawrence contends the government failed to prove that he voluntarily and knowingly waived those rights.  The district court held an evidentiary hearing on Lawrence's motion to suppress and viewed a videotape of the interrogation and Lawrence's statement.  The district court issued a fourteen-page opinion denying the motion in material part.  Without specifically identifying error in the district court's opinion, Lawrence maintains that he did not effectively waive his *Miranda* rights.

When reviewing the denial of a motion to suppress a statement allegedly taken in violation of a defendant's *Miranda* rights, we review the district court's factual findings for clear error and its legal conclusions de novo.  *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010).  A factual finding is clearly erroneous only when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).  We defer to the district court's assessment of credibility, *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999), review the evidence in the light most likely to support the district court's decision, *Al-Cholan*, 610 F.3d at 954, and consider the evidence in the light most favorable to the government, *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008).

"Statements made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly and intelligently.'"  *Al-Cholan*, 610 F.3d at 954 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)).  In determining whether a waiver is valid, we examine the totality of

the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724 (1979).  A voluntary waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The question is not whether Lawrence knew and understood every possible consequence of a waiver, but rather whether he knew that he could "'choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Colorado v. Spring*, 479 U.S. at 574).  "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 2262.

According to testimony at the evidentiary hearing, police officers arrested Lawrence at around 9:30 a.m. on January 9, 2005, in Columbus, Ohio, three days after the attempted bank robbery and killing.  The officers did not read him his *Miranda* rights.  Lawrence was handcuffed behind his back and transported to the Columbus Police Department.  An officer who observed him said Lawrence appeared to be uncomfortable and in pain, as his left arm was wrapped in a thick white bandage and a soft cast.  Lawrence said he was missing some fingers and had a bullet lodged in his forearm.  Lawrence did not complain of pain and did not ask for medical attention.  The officer did not read Lawrence his *Miranda* rights or question him.

At the Columbus Police Department, Lawrence was interrogated by Detective James McCoskey and FBI Special Agent Harry Trombitas.  The interview began at 10:42 a.m.  The videotape showed that McCoskey told Lawrence he knew he was in pain. R. 120, Opinion at 10, Page ID # 844.  McCoskey informed Lawrence that he was being charged with bank robbery.  McCoskey asked Lawrence if he would talk.

Lawrence responded that he was sorry and wanted to cooperate, saying, "Let's get this over with." *Id.* McCoskey questioned Lawrence about his education, literacy, hearing, and vision and about whether he had consumed any alcohol or narcotics within the previous twenty-four hours. Lawrence said that he was in the habit of smoking marijuana, but was "perfectly fine." *Id.*

McCoskey had Lawrence read a *Miranda* rights form out loud, explained the rights, and asked Lawrence if he understood. Lawrence responded by asking what time it was. McCoskey told him the time and then read a waiver form to Lawrence. Lawrence indicated that he understood. When McCoskey asked Lawrence to sign the waiver form, Lawrence refused, saying: "I don't want to sign anything. I'll talk to you guys." *Id.* at 11, Page ID # 845. Lawrence confessed to shooting Hurst and robbing other banks. The interrogation lasted about one hour.

McCoskey testified that it was apparent that Lawrence was in some pain and that he saw Lawrence wince. After being offered a break in the questioning, Lawrence indicated he needed to get to the hospital. McCoskey denied telling Lawrence that he would take him to the hospital as soon as he finished answering questions, but said he told Lawrence that they were going to get him to the hospital. R. 176, Suppression Hrg. tr. at 61–62, Page ID # 6335–36. Lawrence did not otherwise indicate that he was in pain or request medical attention, and he did not ask for an attorney. R. 120, Opinion at 11, Page ID # 845.

Lawrence introduced a hospital-admission assessment form through a nurse. The form indicated that Lawrence was assessed at 9:20 p.m. on the day of the interrogation. He told the nurse that his pain was at nine on a scale of zero to ten, and he complained of constant and burning pain. The form also recorded that he had problems with cognition/perception.

The district court was "convinced" that Lawrence knowingly, willingly, and voluntarily waived his *Miranda* rights when he gave his statement to the police. According to the court, Lawrence appeared alert, his voice was strong, and he did not slur his words. The district court found that the videotape refuted Lawrence's claim that

pain prevented his statement from being voluntary.  The court noted that Lawrence declined breaks and did not ask for medical attention.  The court concluded that Lawrence had an overall desire not only to waive his rights, but also to "admit to the crimes he had committed."  R. 120, Opinion at 11–12, Page ID # 846–47.

Deferring to the district court's assessment of credibility and viewing the evidence in the light most favorable to the government and most likely to support the district court's decision, we find no basis for holding that the district court clearly erred in its factual findings or misapplied the law.  The facts found by the district court show that Lawrence understood his rights and chose to waive them by speaking to the officers.  Although Lawrence did not sign the waiver form, he showed no reluctance to talk and did not invoke his rights to remain silent or to request an attorney.

Moreover, there is no evidence to support Lawrence's argument that the police prohibited him from receiving medical attention.  McCoskey acknowledged that Lawrence appeared to be in pain, but Lawrence did not ask for immediate medical attention or indicate that he was in such pain that it affected the voluntariness of his statement.  Lawrence was shot on January 6, treated at a hospital on January 7, and questioned on January 9.  The fact that he told a nurse several hours later that he was in considerable pain does not establish how much pain he was in while being questioned ten or eleven hours earlier.  Considering the totality of the circumstances, the district court's determination that Lawrence voluntarily, knowingly, and intelligently waived his *Miranda* rights is not clearly erroneous.

## 20.  Racial Bias in Prosecution

Lawrence argues that the process of charging and trying him in federal court rather than state court was racially biased and irrationally based on geography so as to dilute the presence of African Americans in the jury pool, thereby violating his Sixth Amendment right to a fair and impartial jury, his Fifth Amendment rights to equal protection and due process of law, and the Eighth Amendment prohibition against arbitrary use of the death penalty.  Lawrence raised this issue in the district court by filing a motion to dismiss the government's notice of intent to seek the death penalty and

to permit discovery regarding the government's charging practices in capital cases. The district court denied the motion, holding that Lawrence's statistical evidence failed to show the government's charging practices had discriminatory effect; that he failed to present any evidence of discriminatory intent; and that he failed to make the requisite "colorable" showing of selective prosecution to justify discovery.

We review Lawrence's constitutional challenge de novo. To the extent the district court's ruling is premised on findings of fact, we review for clear error. *See United States v. Grenier*, 513 F.3d 632, 635–36 (6th Cir. 2008). A defendant seeking to prove selective prosecution must show that prosecutorial policy had a discriminatory effect and purpose. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. Such a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292; *see also United States v. Bass*, 536 U.S. 862, 864 (2002) (holding that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." (italics in original)); *Keene v. Mitchell*, 525 F.3d 461, 464 (6th Cir. 2008) (holding that statistics indicating a disparity between the percentage of African Americans in the general population and the percentage charged with capital murder, standing alone, failed to demonstrate that race played a part in the defendant's prosecution and sentencing as required by *McCleskey*).

Lawrence's arguments in the district court and his challenge on appeal are based exclusively on statistical evidence that he says tends to show the government has sought the death penalty disproportionately in prosecuting minority-group defendants. The district court correctly determined that the evidence is inconclusive. Yet, even if the statistics were viewed as evidencing a racially discriminatory effect in the government's charging practices nationwide, Lawrence has undisputedly not shown that the government prosecuted *him* with discriminatory purpose. Lawrence has adduced no evidence that decisionmakers in his case acted with discriminatory purpose or that

similarly situated individuals of a different race were not prosecuted in federal court. It follows that the district court properly denied relief.  *See Bass*, 536 U.S. at 864; *Armstrong*, 517 U.S. at 465; *McClesky*, 481 U.S. at 292.[3]

### 21.  Presence of Multiple Victims at Trial and Sentencing

Lawrence argues that the district court improperly granted the government's motion to permit Hurst's family to observe the guilt phase of trial and yet to testify at the sentencing hearing.  He contends this decision was contrary to statute and violated his due process rights.

Before trial, the government moved the district court to allow Hurst's family members to both attend the guilt phase of the trial and testify at sentencing.  The district court held that Hurst's family members qualified as "victims" under the Crime Victims' Rights Act, 18 U.S.C. § 3771, who had the right not to be excluded from court proceedings under § 3771(a)(3).[4]  Lawrence contends the question is actually controlled by the statute more specifically applicable to capital cases, 18 U.S.C. § 3510, which defines the right not to be excluded from trial by referring to "victim" in the singular. By allowing more than one victim to attend the trial, the district court is said to have exceeded its statutory authority.

We review a question of statutory interpretation de novo.  *United State v. Coss*, 677 F.3d  278, 283 (6th Cir. 2012).  Ordinarily, the decision whether to exclude witnesses from the courtroom is reviewed for abuse of discretion.  *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003).

We find no error.  Section 3510(b), like § 3771, prohibits district courts from excluding "any victim" from attending a trial merely because the victim may give victim-impact testimony at the sentencing hearing.  Section 3771(e) defines "crime

---

[3]Lawrence has not challenged the denial of his request for discovery.  For lack of evidence that similarly situated persons were treated differently, the request was properly denied.  *See Bass*, 536 U.S. at 864.

[4]The government's motion identified the family members as Hurst's wife and infant daughter, his mother and stepfather, a brother, a sister, aunts, uncles, and cousins.

victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." Section 3510(c) defines "victim" as including all persons defined as victims in 42 U.S.C. § 10607(e)(2). Section 10607(e)(2), in turn, defines "victim" as "a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime." The district court found, and Lawrence has not disputed, that each of Hurst's family members was a "victim" under both of these definitions—i.e., a person who suffered harm as a result of the commission of a crime.

However, Lawrence points to language in § 10607(e)(2)(B), which, in the case of a victim who is deceased, like Bryan Hurst, recognizes, as a victim, *one* person (i.e., a spouse, legal guardian, parent, child, sibling, another family member, or another person) who is designated by the court to assume the rights of the *deceased* victim. Lawrence argues that, because Hurst is deceased, this definition operates to permit only one person to be recognized as a victim for the purpose of attending trial.

Lawrence's argument ignores the obvious. Each of the family members allowed to attend the trial and sentencing proceedings was a victim in his or her own right. None of them was present as a court-designated representative of the deceased victim, Bryan Hurst. Under a straightforward reading of the statutes, each family member met the definitions of victim under 18 U.S.C. § 3771 and 42 U.S.C. § 10607(e)(2) and thus enjoyed the right not to be excluded from the trial simply because he or she might give victim-impact testimony at the sentencing hearing. "Congress has embedded the right of victims' families to attend an accused murderer's trial in federal law." *United States v. Sampson*, 486 F.3d 13, 46 (1st Cir. 2007) (citing 18 U.S.C. § 3510(b) and 42 U.S.C. § 10607(e)(2)(B)). The district court made no error in interpreting these statutes and enforcing the victims' right to observe the trial. Lawrence's objection, based on a stilted interpretation of § 10607(e)(2), is rejected.

In a second challenge, Lawrence maintains that the mere presence of a large number of Hurst's family members and fellow police officers at the sentencing hearing violated his due process rights by creating an unacceptable risk that jurors would base

their verdict on impermissible factors. In contrast, Lawrence's family members were excluded from the courtroom during the sentencing phase until after they had testified. This disparity, Lawrence contends, could have been viewed by jurors as suggesting that Hurst's life was more valuable because he had more family support. In response, the government points out that Lawrence's family attended the trial, that the jury was not told who in the audience was related to Hurst or Lawrence, that Hurst's fellow officers were not in uniform, and that the jury was aware of Lawrence's family's support because more than twenty relatives and friends testified on his behalf at the sentencing hearing.

Lawrence has cited no authority for the proposition that the mere presence of a murder victim's family members in the courtroom can result in inherent prejudice to the defendant's right to a fair trial. In *Carey v. Musladin*, 549 U.S. 70, 75–77 (2006), the Court observed that some "government-sponsored practices" have been held inherently prejudicial, i.e., compelling the defendant to wear identifiable prison clothing during trial or seating four uniformed state troopers immediately behind the defendant during trial. However, the Supreme Court has never held that "private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id*. at 76. The *Carey* Court vacated the Ninth Circuit's grant of habeas relief where the trial court had allowed a murder victim's family members to wear buttons displaying the victim's photograph during trial. *Id.* at 77. *See also United States v. Farmer*, 583 F.3d 131, 149 (2d Cir. 2009) (holding that family members' wearing of t-shirts bearing the victim's photograph during trial was not inherently prejudicial).

Here, Lawrence does not allege that Hurst's family members engaged in any prejudicial conduct. He objects to the fact that they were present to observe the proceedings, in exercise of their rights under the Crime Victims' Rights Act. The mere presence of family members observing the prosecution of one charged with the murder of their loved one can hardly be deemed to create an unacceptable risk that the jury would be influenced by impermissible factors. We reject Lawrence's claim that family members' presence at the sentencing hearing violated his due process rights.

**22. Alternate Juror Misconduct**

Lawrence contends the district court erred by failing to investigate evidence of misconduct by an alternate juror. The evidence, which came to light after sentencing, suggested that the juror gave false answers in his pretrial questionnaire, contacted the victim's widow after trial, and may have engaged in premature deliberations before he was excused. Lawrence moved for a new trial, and the district court denied the motion without conducting an evidentiary hearing.

A district court's decision to deny a motion for a new trial based on an allegation of juror misconduct is reviewed for abuse of discretion. *United States v. Wettstain*, 618 F.3d 577, 590 (6th Cir. 2010). The abuse-of-discretion standard also applies to the decision whether to investigate an allegation of juror misconduct. *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006). To obtain a hearing to investigate evidence of juror misconduct, "a defendant must do more than simply raise the possibility of bias." *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005). He must raise a "'colorable claim of extraneous influence.'" *Id.* (quoting *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999)). "[R]efusal to hold an evidentiary hearing is not an abuse of discretion where there is no credible allegation of extraneous influence or information." *Lloyd*, 462 F.3d at 518.

Prior to trial, all potential jurors completed questionnaires which asked, among other things, whether they, a member of their family, or a friend were or had been members or employees of a law enforcement agency and whether they, a member of their family, or a friend knew anyone who was injured or killed by a firearm. They were also questioned along these lines in voir dire. After Lawrence was sentenced, one of the alternate jurors who was dismissed before deliberations began contacted Hurst's widow by e-mail. The juror told her, contrary to answers given in his questionnaire, that he had friends and family in law enforcement, and that a family friend had been shot and killed in the line of duty. The e-mail message also indicated that "we were all on your side" and that he would have voted for the death penalty, but "had no say in it" as an alternate.

The government informed the district court of this contact, and Lawrence cited this juror misconduct in support of his motion for a new trial. Lawrence argued that the alternate juror completed his questionnaire untruthfully and appeared to have engaged in premature deliberations with other jurors. Lawrence requested a hearing to determine whether the jury deliberations had been influenced by the alternate juror's evident bias. The district court carefully considered Lawrence's arguments before denying relief. R. 258, Opinion and Order at 12–19, page ID # 2356–63. The court concluded that the false answers in the questionnaire had no impact on the composition of the jury or its deliberations because the alternate juror was excused and did not participate in deliberations. The court also found that the statement "we were all on your side" failed to establish a prima facie case of juror misconduct that warranted a hearing.

We find no error and no abuse of discretion in either determination. The apparently false answers in the alternate juror's questionnaire may show misconduct, but any possibility that bias influenced the jury was removed when the alternate juror was excused—*unless* there was a colorable showing that the jury was influenced by the bias before the juror was excused. "We were all on your side" does not amount to such a colorable showing. On its face, the statement is nothing more than an expression of sympathy for the young widow of a slain police officer. It does not support a reasonable inference that jurors engaged in premature deliberations. After all, there was no dispute at trial that Hurst was shot and killed during the course of an attempted armed bank robbery and that Lawrence was the would-be robber who fired the fatal shot. Any rational juror would have felt sympathy toward Hurst's widow, and the alternate juror's post-verdict remark about this shared sympathy does not imply prejudgment or premature deliberations on the questions the jury was ultimately asked to decide in its verdicts.

Lawrence having thus failed to raise a colorable claim of extraneous influence, we find no abuse of discretion in the district court's refusal to conduct a hearing to investigate the matter further.

**23. *Batson* Challenge**

Lawrence contends the government violated his rights during jury selection by using peremptory strikes to remove three "death-qualified" African American members of the venire. The district court overruled Lawrence's objections below. We review a district court's decision on a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), with great deference under the clear-error standard. *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012). Deference to the trial court's findings is particularly appropriate because evaluation of the prosecuting attorney's race-neutral explanation for a peremptory challenge requires assessment of counsel's credibility, a matter peculiarly within the trial court's province. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

In *Batson*, the Court recognized that the Equal Protection Clause guarantees "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." 476 U.S. at 85–86. Purposeful racial discrimination in jury selection thus violates the defendant's right to equal protection. A *Batson* challenge entails three distinct and sequential steps. *McAllister*, 693 F.3d at 578. First, the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race. The burden then shifts to the proponent of the peremptory strike to articulate a race-neutral explanation. Finally, the trial court must determine whether the opponent of the strike has proven purposeful discrimination.

To establish a prima facie case, the defendant must show that (1) he is a member of a cognizable racial group; (2) the prosecution has removed a member of his race; and (3) circumstances raise an inference that the removal was motivated by race. *Id.* at 578–79. If a prima facie case is established, the prosecution's burden is not onerous; the race-neutral explanation need not be particularly persuasive or plausible. *Id.* at 579. "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). The trial court must then assess the plausibility of the prosecution's explanation in light of all the evidence, to determine whether the defendant has met his burden of proving purposeful

discrimination. *McAllister*, 693 F.3d at 580. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

Here, during voir dire, Lawrence raised *Batson* objections to three peremptory excusals of African American venire persons, Jurors 72, 194, and 115. When the district court asked the prosecution to explain its decision to remove Juror 72, the government referred to its earlier announced intention to remove every juror who responded affirmatively to the jury questionnaire statement, "I can never under any circumstance vote for the death penalty." Despite Juror 72's assurance during voir dire that her opposition to the death penalty would not substantially impair her ability to impose the death penalty under certain circumstances, the district court found the prosecution's intention nondiscriminatory. However, the court cautioned that it would monitor the government's use of peremptory strikes for any evidence of a pattern. R. 279-1, Trial tr. vol. 5 at 147–48, Page ID # 4041–42.

Juror 194 was excused under similar circumstances, based on her questionnaire statement of opposition to the death penalty. When Lawrence's counsel protested that Juror 194 had explained in response to questioning that she would follow the law, the district court noted that the prosecution had consistently excused both black and white jurors because of their answers on the questionnaire. Indeed, the record shows that the prosecution also struck three white prospective jurors because of their questionnaire response indicating unwillingness to impose the death penalty. Finding the prosecution's explanation consistently applied and race neutral, the court denied the *Batson* challenge. *Id.* at 179–81, Page ID # 4073–75.

Lawrence also objected to the government's peremptory excusal of Juror 115, who did not indicate opposition to the death penalty in his questionnaire. The government gave three reasons for removing Juror 115. First and most importantly, Juror 115 was acquainted with one of Lawrence's relatives, a brother or stepbrother, Rico Lawrence. The government also noted that Juror 115 appeared to be sleeping

during voir dire and failed to respond to questions the district court asked, suggesting a hearing problem. The district court questioned Juror 115 about his knowledge of Rico Lawrence. Despite Juror 115's assurances that his knowledge of Rico would not affect his ability to be fair and impartial, the court ultimately overruled Lawrence's objection, finding no discriminatory intent. *Id.* at 158–70, Page ID # 4052–64.

We find no error in the district court's rejection of Lawrence's *Batson* objections. Lawrence made out a prima facie case of race discrimination. The prosecution came forward with race-neutral explanations. Opposition to the death penalty is a race-neutral reason for exercising a peremptory strike. That the prosecution used peremptory strikes to remove both white and black venire persons whose questionnaires stated they would not impose the death penalty indicates there was no pattern of race discrimination. The government's explanation for excusing a prospective juror who was acquainted with defendant Lawrence's brother or stepbrother is facially reasonable and does not suggest discriminatory intent. Acknowledging our duty to defer to the district court's assessment of the prosecuting attorney's credibility, we deny Lawrence's *Batson* claim of error. The record falls far short of satisfying Lawrence's burden to show purposeful discrimination.

### 24. Refusal to Excuse Prospective Jurors for Cause

Lawrence contends the district court erred by denying his requests to remove three prospective jurors for cause because they were not impartial. Lawrence challenged four jurors for cause. When the district court denied Lawrence's requests, he used peremptory challenges to remove three of the jurors. The fourth was not called to serve. Yet, though Lawrence does not contend that any juror who ultimately sat on the jury was biased, he argues that his right to a fair trial was compromised because he was forced to use peremptory challenges that might have been used more effectively.

Ordinarily, we would review the district court's voir dire determinations for abuse of discretion. *United States v. Lanham*, 617 F.3d 873, 882 (6th Cir. 2010). The court's finding that a prospective juror is impartial is entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence. *Id.*

However, if a defendant exercises a peremptory challenge to remove a juror the district court refused to excuse for cause, and does not allege that a biased juror sat on the jury or that he needed more peremptory challenges, he has not been deprived of his procedural or constitutional rights. *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000). In such a case, we need not review the merits of Lawrence's claim that the district court should have dismissed the jurors for cause. *United States v. Quinn*, 230 F.3d 862, 865–66 (6th Cir. 2000); *see also United States v. Lee*, 374 F.3d 637, 649 (8th Cir. 2004).

Lawrence attempts to invoke the only potentially applicable exception to this rule, arguing that the district court "deliberately misapplied the law" in order to force him to use peremptory challenges to correct the court's error. *See Martinez-Salazar*, 528 U.S. at 316 (citing *Ross v. Oklahoma*, 487 U.S. 81, 91 n.5 (1988)). This argument is raised for the first time in Lawrence's reply brief and consists of only a few sentences. Lawrence does not identify how the district court "misapplied the law" except to state his disagreement with the court's determination that the three challenged jurors were not shown to be biased. Nor does the record suggest any such misapplication of the law. The record shows that all three challenged prospective jurors, in response to voir dire questioning, stated that they could set aside their prior feelings and judge the case fairly. Lawrence has not identified clear and convincing evidence that the district court's acceptance of the jurors' statements at face value was clearly erroneous or otherwise an abuse of discretion. We thus find no basis for holding the district court deliberately misapplied the law.

Lawrence was not deprived of his allotted number of peremptory challenges; he does not allege that a biased juror remained on the panel; and the record affords no support for the notion that the district court deliberately misapplied the law. Accordingly, Lawrence's final claim of error is denied.

**III**

We have thus carefully considered all twenty-four claims of error asserted by defendant Lawrence on direct appeal.  We have found no error in the proceedings below that warrants relief.  That twelve citizens deliberated on the evidence and concluded under the law that a sentence of death is justified for the murder of Officer Bryan Hurst is a grave matter that brings no consolation.  Yet, our thorough review of the issues presented convinces us that defendant Lawrence's rights under the law have been protected throughout the proceedings.  The judgment of the district court is therefore **AFFIRMED**.